UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VISIBLE SYSTEMS CORPORATION,<br><br>      Plaintiff<br><br>v.<br><br>UNISYS CORPORATION,<br><br>      Defendant | Civil Action No. 04-CV-11610-RGS |

## DEFENDANT'S TRIAL MEMORANDUM

### I. Introduction

This trademark infringement case involves the right of the defendant, Unisys Corporation, a leader in the field of information technology-based consulting, to use the phrase 3D VISIBLE ENTERPRISE in promoting its services. The plaintiff, Visible Systems Corporation ("VSC"), a Lexington, Massachusetts software company, uses the word VISIBLE in the name of its company and a number of its software products. VSC has brought this action under a theory of "reverse confusion." That is, as discussed further below, VSC contends that Unisys has advertised and promoted its 3D VISIBLE ENTERPRISE mark in a way that has saturated the market in which VSC competes, and overwhelmed VSC's reputation,[1] such that potential customers of VSC are likely to be confused into thinking that its goods are those of Unisys.[2]

VSC asserts in its complaint claims of trademark infringement under 15 U.S.C. § 1114 and Massachusetts common law (Counts I, VI), and unfair competition under 15 U.S.C. §

---

[1] 4 J.T. McCarthy, *McCarthy on Trademarks & Unfair Competition* § 23:10 at 42 (4th ed. 2007) [hererinafter *McCarthy*].
[2] *Id.*

1125(a) and Mass. Gen. L. ch. 93A, § 11 (Counts II, IV). VSC also makes a claim of trademark dilution under 15 U.S.C. § 1125(c) and Mass. Gen. L. ch. 110B, § 12 (Counts III, V). VSC seeks injunctive and other equitable relief barring Unisys from using 3D VISIBLE ENTERPRISE as a trademark.[3] It also seeks damages in the form of alleged lost sales, and seeks to have Unisys "account for and pay over... all gains, profits and advantages derived" from the alleged infringement. Finally, VSC asserts a separate claim seeking a declaration that Unisys's 3D VISIBLE ENTERPRISE mark may not be registered as a federal trademark (Count VII). Unisys has filed a counterclaim seeking the revocation of VSC's registration for the trademark "VISIBLE."[4]

## II.     Applicable Standard for Trademark Infringement

"Trademark law seeks to prevent one seller from using the same 'mark' as—or one similar to—that used by another in such a way that he confuses the public about who really produced the goods (or service)."[5] "Such confusion may prevent the buyer from obtaining the goods he seeks or may endanger the reputation of the first user of the mark by association with the subsequent user."[6] By seeking to prevent consumer confusion, the law "encourages production of products of high quality 'and simultaneously discourages those who hope to sell inferior products by capitalizing on a consumer's inability quickly to evaluate the quality of an item offered for sale.'"[7]

A federal trademark infringement claim requires a plaintiff to prove (a) that the term at issue is valid and protectible as a trademark; (b) that the plaintiff has acquired exclusive rights to

---

[3] *See* VSC's May 3, 2005 First Amended Complaint ¶ 16.
[4] *See* Unisys's Amended Answer and Counterclaim.
[5] *Equine Techs., Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 544 (1st Cir. 1995).
[6] *Hasbro, Inc. v. Clue Computing, Inc.*, 66 F. Supp. 2d 117, 121 (D. Mass. 1999).
[7] *I.P. Lund Trading ApS and Kroin Inc. v. Kohler Co.*, 163 F.3d 27, 36 (1st Cir. 1998) (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164 (1995)).

use of the mark for relevant purposes; and (c) that the defendant has used a similar mark that is likely to cause confusion, mistake or deception among relevant potential consumers as to whether the companies and/or their goods or services are associated with one another.[8]

    A.    <u>Legally Protectable Right In Trademark</u>

The first requirement VSC must meet in this case is that it has a legally protectible trademark in the term VISIBLE.[9] A trademark is characterized by how it operates in the minds of potential consumers: to identify the goods or services of one person and distinguish them from the services of others.[10] A mark is considered a potential subject of trademark rights if it (a) is inherently distinctive, or (b) though not inherently distinctive, has become distinctive in the minds of consumers—that is, has acquired "secondary meaning."[11]

The only "incontestable" registrations that bear even momentary consideration in this case are VSC's 1985 registrations of VISIBLE SYSTEMS CORPORATION and VISIBLE SYSTEMS. But those registrations were only for limited use on "computer programs recorded on magnetic disks."[12] Furthermore, as "composite marks" (that is, marks made up of multiple words) these marks were only ever entitled to the statutory presumption of validity—including the presumption of distinctiveness and non-descriptiveness—as a whole, and did not of

---

[8] *See, e.g., Nat'l Nonwovens, Inc. v. Consumers Prods. Enters., Inc.*, 397 F. Supp. 2d 245, 257 (D. Mass. 2005).

[9] VSC also asserts in passing that it owns trademark rights in the combined term VISIBLE ENTERPRISE. *See* VSC's Amended Complaint ¶ 15. But there is no evidence that the company made any substantial use of this term as a trademark before the inception of this litigation.

[10] *See* 15 U.S.C. § 1127. The term "trademark" in its specific sense refers to marks used to identify goods, while "service mark" is used for marks identifying services. *See id.* For simplicity herein, the more common terms "trademark" (in its general sense) and "mark" are used interchangeably to refer to marks used to identify goods or services.

[11] *See, e.g.,* ALI, *Restatement (Third) of the Law of Unfair Competition* ("Restatement") § 13 (1995).

[12] *See id.*

3

themselves give VSC any right to protect any individual word, including VISIBLE.[13] VSC also gains no right to the word "VISIBLE" alone by disclaiming in its registration the other words of its mark. A disclaimer "does not have the effect of removing from the registered mark the matter disclaimed. It disclaims only a claim that the federal registration gives an exclusive right in those disclaimed words or symbols per se. That is, the applicant is merely stating that he is claiming only the whole composite mark as his property, and makes no claim to those particular portions disclaimed" standing "apart from the composite as a whole."[14]

The two more recent registrations on which VSC relies are both contestable, and should be understood as confined to the use of VISIBLE in selling software products and assisting purchasers with use and implementation of those products. More specifically, VSC's December 2001 registration of VISIBLE was for use on "Computer programs for database and application development; Configuration management; Data warehousing; Object, data, and process modeling, namely, data flow diagrams and entity-relationship diagrams recorded on machine readable media." Three months later, in March 2002, VSC registered VISIBLE for "Training, namely providing courses of instruction and seminars in the field of information technology" and for "Consulting services, namely providing advice in the field of information technology." Reading the registration documents as a whole, and construing ambiguities—including, for example, in the meaning of the phrase "in the field of information technology"—against VSC,[15] the registrations should be understood as affording presumptive protection for "consulting" or other services only as related to VSC's primary business: the sale of its "computer programs"—

---

[13] *See, e.g., In re National Data Corp.*, 753 F.2d 1056, 1059 (Fed. Cir. 1985).
[14] *McCarthy* § 19:63 at 19-212-13. *And see, e.g., Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d 355, 362-63 (11th Cir. 1997) (Registrant of mark LONE STAR CAFE, who disclaimed CAFE in the registration, did not thereby acquire presumptive rights as to LONE STAR).
[15] *See David Crystal, Inc. v. Soo Valley Co.*, 471 F.2d 1245, 1246 (C.C.P.A. 1973).

4

i.e., software products. Furthermore, any presumption of broader protection for use of VISIBLE in connection with services is rebutted by the evidence as to the actual nature and composition of VSC's business, in which the services offered by the company are clearly secondary to and dependent upon its core software-products business.

Under these circumstances, VSC's trademark registration history at most establishes that it has a presumptive right to use VISIBLE for computer programs, and for courses, seminars and advice specifically related to and in support of the sale of VSC's products. Thus, in this case VSC must rely on establishing that it has common-law exclusive rights to the term VISIBLE that are broader than the limited rights arising from its registrations. This VSC cannot do.

There is a critical limitation on the reach of trademark protection: it does not protect "descriptive" terms. The law seeks to prevent the appropriation by trademark owners of useful descriptive words in ways that would "limit the ability of other sellers to emphasize the characteristics of their own goods, services or business."[16] Given the inherent finitude of language, and the importance of preserving a free marketplace of useful words, courts have recognized "the undesirability of allowing anyone to obtain a complete monopoly on use of a descriptive term simply by grabbing it first."[17] "There is a well-recognized public interest in prohibiting the commercial monopolization of" ordinary language, and courts should be wary "[w]hen a business claims the exclusive right to use words or phrases that are part of our common vocabulary.... Language, even in a commercial context, properly belongs to the public unless Congress instructs otherwise."[18]

---

[16] *See* Restatement § 14 cmt. a at 121.
[17] *See KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 122 (2004) (citation omitted).
[18] *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 215 (Stevens, J., dissenting) (citing, *inter alia*, *Bada Co. v. Montgomery Ward & Co.*, 426 F.2d 8, 11 (9th Cir.

The term VISIBLE as used to refer to VSC's software tools for modeling information technology and other systems is fundamentally descriptive, because the predominant idea conveyed by the term is one that is commonly cited and understood as an attribute of modeling in a variety of fields—the idea that the essential purpose of a model is to enable a user to see and understand that which would otherwise be invisible and incomprehensible. As VSC itself acknowledges, the term "is used as a metaphor for making software and systems comprehensible, manageable, coherent, modeled, diagramed, documented, subject to graphic representation." This is not a metaphor that requires an "imaginative leap" by a putative VSC customer—rather, it is an everyday English adjective that is in wide descriptive use not only by the parties in this case, but legions of other businesses as well. Given the nature of VSC's products, the "characteristics," "purpose," "function" and "effect" being described are necessarily somewhat abstract. But the adoption and use of the term VISIBLE plainly represents an attempt to capture and describe these qualities—and not to devise a unique and distinctive identifier of product source.

Therefore, the evidence will show that a consumer in the relevant software market served by VSC would naturally regard the term VISIBLE on its face as essentially descriptive of a characteristic or effect of the product, rather than as a source identifier.[19] Nor can VSC show that the term VISIBLE has become distinctive of VSC or its products—has acquired "secondary meaning."

---

1970) ("One competitor will not be permitted to impoverish the language of commerce by preventing his fellows from fairly describing their own goods."); *Canal Co. v. Clark*, 80 U.S. 311, 323-24 (1871) (The owner of a trademark "has no right to appropriate a sign or symbol which, from the nature of the fact it is used to signify, others may employ with equal truth, and therefore have an equal right to employ for the same purpose.")).

[19] On this basis, Unisys has asserted a counterclaim against VSC seeking an order canceling VSC's registrations of VISIBLE on the ground that the term is merely descriptive.

"To establish secondary meaning, a manufacturer must show that, in the minds of the public, the *primary significance* of a... term is to identify the source of the product rather than the product itself."[20]  "Furthermore, the plaintiff must show that these consumers base purchasing decisions upon seeing the trademark... on the product.... '[The mark] must prompt the reaction, "That is the product I want because I know that all products with that label come from a single source and have the same level of quality."'"[21]  And even where a descriptive term has acquired secondary meaning, what the user is entitled to protect is only "the penumbra or fringe of secondary meaning which surrounds the old descriptive word," and not the original descriptive sense.[22]

"Proof of secondary meaning entails vigorous evidentiary requirements."[23]  The most straightforward way for a plaintiff to establish secondary meaning is through survey evidence—that is, a survey of relevant consumers showing that they do indeed attribute the alleged secondary meaning to the term.  "The importance of qualified survey evidence in establishing secondary meaning is well established."[24]  Mere evidence of the strength of plaintiff's accomplishments under its name, or evidence that the name is recognized by a limited group of

---

[20] *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982) (emphasis added). *And see I.P. Lund*, 163 F.3d at 42 (confirming that "primary significance" is the applicable "stringent" standard).

[21] *Flynn*, 377 F.3d at 20 (quoting *McCarthy* § 15:11).

[22] *See KP Permanent*, 543 U.S. at 122 (quoting 2 *McCarthy* § 11:45).  Indeed, one who selects a descriptive term as a trademark is deemed to *assume the risk* of consumer uncertainty resulting from subsequent descriptive uses by others in the marketplace.  *Id.*

[23] *See Flynn*, 377 F.3d at 20.

[24] *President and Trustees of Colby College v. Colby College-N.H.*, 508 F.2d 804, 809 (1st Cir. 1975) (citing cases).  *See also Boston Beer Co.*, 9 F.3d at 182 (surveys and individual consumer testimony are the only possible direct evidence of secondary meaning).

"insiders," is not sufficient.[25]  Nor does evidence suggesting isolated incidents of purported association by customers between product and name establish secondary meaning.[26]

VSC has no survey or other such direct evidence of significant secondary meaning. And Unisys expects that the other evidence will be inadequate to show that the term VISIBLE has achieved the "primary significance" in the minds of any relevant substantial number of consumers as identifying VSC as the single, specific, favorably known source of a product or service.  In particular, VSC will be unable to prove such a reputation among any population conceivably likely to be exposed to and influenced by Unisys's 3D VISIBLE ENTERPRISE mark.

    B.    <u>Likelihood of Confusion</u>

Once a plaintiff establishes a legally protectable right in a trademark, the plaintiff must then demonstrate that the defendant's use of its trademark would establish a "likelihood of confusion" among relevant consumers.  The ordinary test for likelihood of confusion is whether a reasonably prudent purchaser of plaintiff's or defendant's goods or services, exercising ordinary care in the purchase, would be confused, mistaken or deceived as to whether the defendant's mark suggests a relationship with the plaintiff.[27]  This probability naturally varies with circumstances, and in a case that involves professional or otherwise discriminating buyers, the standard for proof of likelihood of confusion is elevated.  "Many cases state that where the relevant buyer class is composed of professionals or commercial buyers familiar with the field, they are sophisticated enough not to be confused by trademarks that are closely similar."[28]

---

[25]  *Flynn*, 377 F.3d at 20-21.
[26]  *See Globallaw Ltd. v. Carmon & Carmon Law Office*, No. CIV A 03-950 CKK, 2006 WL 2598212, at *33 (D.D.C. Sept. 11, 2006).
[27]  *See* Restatement § 20 cmt. h at 217.
[28]  4 *McCarthy* § 23:101.

8

A "likelihood" of confusion means that it is *probable*—it is irrelevant that confusion is merely possible. A plaintiff must show a "substantial" likelihood of confusion, and this is more than mere semantics.[29] "Confusion" refers to the "act of mistaking one thing for another, of failing to note distinctions, and of falsely identifying."[30] "The fact that one mark may bring another mark to mind does not in itself establish confusion.... The very fact of calling to mind may indicate that the mind is distinguishing, rather than being confused by, two marks."[31] For example, one may associate two marks not in confusion but in recognition that the respective offerings are comparable but different.[32]

The interests at stake in the likelihood-of-confusion analysis are, on the one hand, the trademark owner's right to control the consistency and quality of product thought to emanate from it, and the consumer's right to buy or not buy free from confusion.[33] These interests must be balanced against the objectives of free competition. Thus, a trademark is protected only to the extent necessary to avoid likelihood of confusion.[34]

To be actionable, the putative confusion must be likely to threaten the commercial interests of the owner of the mark.[35] That is, confusion must exist among relevant consumers—prospective purchasers of plaintiff's or defendant's goods or services, persons in a position to

---

[29] *See Star Fin. Servs., Inc. v. Aastar Mortgage Corp.*, 89 F.3d 5, 10 (1st Cir. 1996). *See also Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 663-64 (5th Cir. 2000).

[30] *See Rockland Mortgage Corp. v. Shareholders Funding, Inc.*, 835 F.Supp. 182, 196 (D. Del. 1993).

[31] *See In re Ferrero*, 470 F.2d 1395, 1397 (C.C.P.A. 1973).

[32] *See id.*; *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.*, 626 F.2d 193, 195 (1st Cir. 1980) (evidence that consumers were prompted to wonder and inquire about relationship between companies, "[f]ar from revealing... confusion [as to source],... indicate that these consumers, at least, had the difference in source clearly in mind.").

[33] *See* Restatement § 9 cmt. c at 77-78; *Volkswagenwerk AG v. Wheeler*, 814 F.2d 812, 820 (1st Cir. 1987).

[34] *See Nora Beverages v. Perrier Group of Am., Inc.*, 269 F.3d 114, 119 (2d Cir. 2001).

[35] *See* Restatement § 20 cmt. b at 210; *Beacon Mut. Ins. Co. v. OneBeacon Ins. Group*, 376 F.3d 8, 13 (1st Cir. 2004).

influence purchasing decisions, or other persons whose confusion is shown to threaten the plaintiff's commercial interests.[36] The focus is on individual consumers, rather than organizations: the fact that two parties both offer goods or services, for example, to corporations or government agencies, or even to particular kinds of such organizations, is not sufficient—"the likelihood of confusion must be shown to exist not in the purchasing *institution*, but in a customer or purchaser."[37]

Evidence of actual confusion is "often deemed the best evidence" of likely future confusion.[38] While proof of instances of actual confusion is not necessary (or, where it is offered, by itself sufficient) to establish the likelihood of confusion necessary for an infringement claim, the absence of proof of actual confusion is significant, particularly where the marks at issue have existed side by side in the marketplace for a substantial time.[39] In addition to the sophistication and attentiveness of potential consumers, and the existence or not of actual confusion, courts in the First Circuit look to several other areas of potential circumstantial evidence that confusion is likely, including (a) whether the marks at issue are similar; (b) whether the plaintiff's mark is strong; (c) whether the parties offer similar goods or

---

[36] *See Astra Pharm.*, 718 F.2d at 1207-1208; *Beacon Mut. Ins. Co.*, 376 F.3d at 16-17. In *Beacon Mutual*, the First Circuit held that a trial judge erred in refusing to consider, at summary judgment, evidence of 249 instances of actual confusion involving non-purchasers which arguably threatened plaintiff's goodwill and reputation. *See id.* at 17-18.

[37] *Astra Pharm.*, 718 F.2d at 1206.

[38] *See Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 40 (1st. Cir. 2006).

[39] *See, e.g., Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 999 F.2d 1, 4 (1st Cir. 1993) ("[T]he weak evidence of actual confusion weighs quite heavily against a finding of likelihood of confusion" where products had co-existed for six years); *Pignons S.A. v. Polaroid Corp.*, 657 F.2d 482, 490 (1st. Cir. 1981) (no likelihood of confusion; co-existence for four years with limited evidence of actual confusion); *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 377 (1st Cir. 1980) (no likelihood of confusion; co-existence for three and one half years without evidence of actual confusion). *Cf. Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 121 (1st. Cir. 2006) (discounting lack of evidence of actual confusion where products had competed for only just over a year). In this case, by contrast with many of those cited, not a single instance of actual confusion has been adduced.

services; and (d) whether the parties operate in the same channels of trade or advertising, and target the same classes of prospective purchasers. Courts also look at whether the defendant adopted its mark in bad faith—that is, with knowledge of the plaintiff's mark and an intent to confuse customers.[40] These factors "are meant to be used as guides," and are neither "all-encompassing [n]or exclusive."[41] "No one factor is determinative, and any other factor that has a tendency to influence the impression conveyed to prospective purchasers by the allegedly infringing conduct may be weighed... in gauging the likelihood of confusion."[42]

### III.    Plaintiff's Reverse Confusion Claim

Having equivocated on the subject until after reviewing Unisys's summary-judgment papers, the plaintiff then announced that this was not an ordinary "forward" confusion case, but rather, its claim is based solely on "reverse" confusion.[43] VSC concedes there is no evidence any such confusion has ever actually occurred, after more than three years in which the marks at issue have co-existed in the marketplace; thus, plaintiff is left to prove in the face of this reality that confusion is nonetheless likely.

While in an ordinary case the plaintiff "asserts that the infringer is diverting the claimant's customers and free-riding on the claimant's reputation and goodwill," in a "reverse confusion" case, the plaintiff's claim is that consumers are likely to believe that it, the alleged "senior user" of the disputed trademark, is claiming an association *with the defendant*, the junior user. "In 'reverse confusion,' customers purchase the senior user's goods under the mistaken

---

[40] *See, e.g., Beacon Mutual Ins. Co.*, 376 F.3d at 15.
[41] *See Int'l Ass'n of Machinists v. Winship Green Nursing Ctr.*, 103 F.3d 196, 201 (1st Cir. 1996).
[42] *Id.*
[43] See Plaintiff's Summary Judgment Brief at 7, 8-9, 19, 20, 28 ("... in a reverse confusion case such as is presented here...."), 29 ("These two latter species of harm are precisely those most likely in a reverse confusion case as is presented here"), 32 ("In the instant reverse confusion case....").

11

impression that they are getting the goods of the junior user [here, Unisys]. That is, reverse confusion occurs when the junior user's [Unisys's] advertising and promotion so swamps the senior user's [VSC's] reputation in the market that customers are likely to be confused into thinking that the senior user's [VSC's] goods are those of the junior user [Unisys]: the reverse of traditional confusion."[44]

"In a reverse confusion case, rather than trying to profit from the senior user's [VSC's] mark, the junior user [Unisys] saturates the market and 'overwhelms the senior user.'"[45]  "The paradigm case is that of a knowing junior user with much greater economic power who saturates the market with advertising of a confusingly similar mark, overwhelming the marketplace power and value of the senior user's mark. When the facts vary from that model, the reverse confusion rule is not applicable."[46]  "Courts should look at the commercial strength of the junior user's mark to determine whether its advertising and marketing has resulted in a 'saturation in the public awareness of the junior user's mark.'"[47]

A.   General Standard

"[T]he requirement of likely confusion is common both to the ordinary 'forward' confusion claim and the 'reverse' confusion variant urged in this case. In assessing confusion, this circuit has resorted to the consultation of a series of factors rather than any mechanical formula...."[48]  However, some of the likelihood of confusion factors must be considered in a different light.

---

[44] 4 *McCarthy* § 23:10.
[45] *Id.*
[46] *Id.*
[47] *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270 (3d Cir. 2001) (finding no likelihood of confusion).
[48] *Attrezzi*, 436 F.3d at 39.

B.     Actual Competition Required

To maintain its reverse confusion claim, VSC must demonstrate that it is an actual competitor of Unisys. Because the very nature of a reverse confusion case requires that the senior user's [VSC's] customers believe that they are purchasing the goods and services of the junior user [Unisys], it necessarily follows that the two parties are actually competing for the same business from the same decisionmakers within the same organizations. "Reverse confusion will not be likely if the goods or services of the parties are not competitive, the respective markets are separated and the advertising of the parties is directed at different types of purchasers. Then, the senior user's customers are generally not aware of the junior user's advertising and promotion and unlikely to be familiar with the junior user's mark. When few of the senior user's customers will be exposed to or familiar with the junior user's mark, there will be no 'overwhelming' or 'swamping' effect on the senior user's mark and good will. In that case, reverse confusion will be unlikely."[49]

C.     Role of Intent

This Court has already ruled at summary judgment that "there is no evidence offered that the defendant, Unisys, adopted [its] mark in bad faith or with any intent to actually do harm to the plaintiff."[50] Despite this clear ruling, plaintiff apparently seeks to revisit this issue at trial.

The question of the defendant's intent is different in a reverse-confusion case. The issue is not whether the defendant intended to take advantage of the reputation and goodwill

---

[49] 4 *McCarthy* § 23:10. *Playmakers LLC v. ESPN, Inc.*, 376 F.3d 894 (9th Cir. 2004); *Checkpoint Sys., Inc.*, 269 F.3d at 270.

[50] *See* Transcript of 03/29/07 Summary Judgment Hearing at 42.

13

surrounding the plaintiff senior user's mark, but rather whether the defendant intended to push the plaintiff out of the market by overwhelming its reputation.[51]

The evidence VSC is expected to offer that certain Unisys employees knew of the existence of VSC, prior to the adoption of the 3D VISIBLE ENTERPRISE mark, has no bearing on the question of bad faith or improper intent. Mere knowledge of the existence of a competitor's mark is insufficient to prove bad faith—particularly where the employees at issue played no role in the defendant's decision to adopt its mark.[52] Knowledge of prior use of a name does not amount to bad faith.[53] And where a second comer chooses a descriptive word as part of the name of its product, more than simple knowledge of prior use is needed to show intent to misappropriate goodwill.[54] Likewise, the fact that Unisys has continued to use the term VISIBLE after the commencement of this dispute is no evidence of bad faith. Continued use of a name adopted with reasonable justification, even in the face of litigation and a likely challenge, does not constitute bad faith.[55]

---

[51] 4 *McCarthy* § 23:10 (citing *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 478 (3d Cir. 2005) (finding no evidence from which factfinder could rationally conclude that defendant intended to push plaintiff senior user out of market)); *Altira Group LLC v. Philip Morris Cos., Inc.*, 207 F. Supp. 2d 1193, 1200 (D. Colo. 2002) (denying preliminary injunction in reverse-confusion case where no evidence of bad intent); *Mars Musical Adventures, Inc. v. Mars, Inc.*, 159 F. Supp. 2d 1146, 1152 (D. Minn. 2001) (summary dismissal in reverse-confusion case where no evidence of bad intent).

[52] *NEC Elecs., Inc. v. New England Circuit Sales, Inc.,* 722 F. Supp. 861, 866 (D. Mass. 1989) (citing *Ziebart Int'l Corp. v. Aftermarket Assoc., Inc.,* 802 F.2d 220 (7th Cir. 1986)). *See also 24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 447 F. Supp. 2d 266, 283 (S.D.N.Y. 2006).

[53] *E. R. Squibb & Sons, Inc. v. Cooper Labs., Inc.,* 536 F. Supp. 523, 532 (S.D.N.Y. 1982).

[54] *Id.*

[55] *See Electrolux*, 999 F.2d at 3, 6 ("[W]hile appellee may have been aware of a challenge, appellee did not act in bad faith in using a mark that it believed available"); *Carl Zeiss Stiftung v. Veb Carl Zeiss Jena*, 433 F.2d 686, 707 (2d Cir. 1970); *24 Hour Fitness USA, Inc.*, 447 F. Supp. 2d at 282-84; *Aureflam Corp. v. Pho Hoa Phat I, Inc.*, No. C 05 00746 RS, 2005 WL 2253813, at *3 (N.D. Cal. Sept. 16, 2005).

The Court should therefore preclude plaintiff from seeking to re-open the issue of bad faith.

### D. Commercial Strength of the Marks

The reverse-confusion doctrine applies only where the evidence shows that (1) the defendant's mark has acquired commercial strength through extensive advertising, while the plaintiff's mark, although conceptually strong (that is, distinctive and unique), is and has remained commercially weak and (2) a consumer encountering the plaintiff's mark would therefore likely associate it with the much better-known defendant. Thus, evidence suggesting that the plaintiff's mark has acquired substantial commercial strength, while helpful to the plaintiff in an ordinary case, has the opposite effect in a reverse-confusion case.[56]

## IV. Plaintiff's "Dilution" Claims

Plaintiff's "dilution" claims should not be part of the trial of this case. The Federal Trademark Dilution Act ("FTDA") has been interpreted to embody a four part test requiring a plaintiff to show "(1) that it owns a famous mark, (2) that the defendant is making commercial use of the mark in commerce, (3) that the defendant adopted its mark after the plaintiff's mark became famous, and (4) that the defendant's mark dilutes the plaintiff's famous mark."[57] "[D]ilution provisions should apply only to … very unique marks," also known as

---

[56] 4 *McCarthy* § 23:10. The Court recognized this point at summary judgment; *see* Transcript of 03/29/07 Hearing at 41-42 ("I agree with defendants' counsel that the strength of the mark argument actually cuts against the plaintiff, given the reverse nature of the case, so to speak, and the positions that the case has taken.")

[57] *Hasbro, Inc. v. Clue Computing, Inc.*, 66 F.Supp.2d 117, 130 (D. Mass. 1999) (citing *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868 (9th Cir. 1999)). The FTDA actually protects against two different types of dilution, "blurring" and "tarnishment." 15 U.S.C.§ 1125(c); *IP Lund Trading ApS*, 163 F.3d at 47-48. Both of these forms of dilution require that the senior user's mark be found to be famous.

15

"Supermark[s]."[58]  The First Circuit has stated that "courts should be discriminating and selective in categorizing a mark as famous."[59]  A mark's reputation must be national and must extend broadly across the general public.[60]  Examples given by Congress of the level of famousness that must be achieved include DUPONT, BUICK and KODAK.[61]  Examples of marks found not to be famous outside of their niche area, and therefore not protected against dilution: LEXIS, STAR MARKET, COLUMBIA, and SPORTS AUTHORITY.[62]

VSC has taken the position that its VISIBLE mark is "famous" only as "associated with a suite of products and services for blueprinting/modeling the software and systems used by enterprises including government agencies and business corporations...."[63]  However, "[a] mark that evokes an association with a specific source only when used in connection with the particular goods or services that it identifies is ordinarily not sufficiently distinctive to be protected against dilution."[64]  Furthermore, evidence of the widespread use of the term VISIBLE in other trademarks not owned by the plaintiff suggests that "any acquired distinctiveness of the plaintiff's mark … has been seriously undermined by third party use of the same or similar marks."[65]  Finally, it should be noted that VSC's dilution claim requires a showing that its mark is famous and, therefore, commercially strong, while its reverse confusion

---

[58] *See IP Lund Trading ApS*, 163 F.3d at 46.
[59] *Id.*
[60] *Id.* at 43, 46-47.
[61] *See* H.R. Rep. No. 374 (1995), 1995 U.S.C.C.A.N. 1029, 1031.
[62] *See Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1030-31 (2d Cir. 1989); *Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F. Supp. 733, 750 (S.D.N.Y. 1997); *Sports Auth., Inc. v. Abercrombie & Fitch, Inc.*, 965 F. Supp. 925, 941 (E.D. Mich. 1997); *Star Mkts., Ltd. v. Texaco, Inc.*, 950 F. Supp. 1030, 1034 (D. Haw. 1996).
[63] *See* VSC's Answers to Interrogatories, No. 19.
[64] *I.P. Lund Trading ApS*, 163 F.3d at 46-47 (citing Restatement § 25 cmt. e).
[65] *Hasbro*, 66 F.Supp.2d at 131.

claim requires a showing that the mark is commercially weak. Certainly, these standards are inconsistent and VSC should not be permitted to assert both claims.

### V.     Plaintiff's Claims Under Massachusetts Law

As noted, VSC asserts several claims specifically under Massachusetts law: claims for trademark infringement under Massachusetts common law, unfair competition under Mass. Gen. L. ch. 93A, § 11, and trademark dilution under Mass. Gen. L. ch. 110B, § 12. Assuming without conceding that Massachusetts law would apply to this case, VSC's state trademark infringement and dilution claims add nothing to their federal counterparts. And plaintiff fails as a matter of law to state a claim under Chapter 93A.

#### A.     Trademark Infringement

An infringement claim under Massachusetts law is subject to the same analysis as a federal-law claim.[66] A plaintiff bears the burden of proving the same elements, including the existence of a protectible trademark and a likelihood of confusion.[67]

#### B.     Massachusetts Anti-Dilution Act

Likewise, the standards applicable to a dilution claim under Massachusetts law are "very similar" to those under federal law.[68] A plaintiff proceeding under state law must show that its mark is "distinctive"—that is, is inherently a strong mark or has secondary meaning. Plaintiff must further show that the defendant's use of a similar mark has created a "likelihood of dilution."[69]

---

[66] *See, e.g., Astra Pharm.*, 718 F.2d at 1205; *Pignons,* 657 F.2d at 486-87.
[67] *Id.*
[68] Mass. Gen. L. ch. 110B, § 12; *Bay State Sav. Bank v. Baystate Fin. Servs., LLC*, 484 F. Supp. 2d 205, 219 (D. Mass. 2007); *Hasbro*, 66 F.Supp.2d at 137.
[69] *Hasbro*, 66 F.Supp.2d at 137.

C.  Chapter 93A

VSC cannot maintain a claim under Chapter 93A because there is simply no evidence that Unisys engaged in any unfair or deceptive act or practice, or in unfair competition. Furthermore, claims under Section 11 of Chapter 93A, such as VSC's claim here, are limited to regulating "actions and transactions" that occur "primarily and substantially" within the commonwealth.[70] To determine whether this requirement has been met, Massachusetts courts examine the "center of gravity" of the allegedly unfair and deceptive conduct.[71] Because this case does not involve conduct that occurred primarily and substantially within Massachusetts, Chapter 93A does not apply.

---

[70] *See* Mass. Gen. L. ch. 93A, § 11 ("No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within commonwealth.").

[71] *See, e.g., National Fire Prot. Ass'n, Inc. v. International Code Council, Inc.*, No. Civ.A.03-10848 DPW, 2006 WL 839501, *6 (D. Mass. Mar. 29, 2006).

Dated: July 13, 2007

                        UNISYS CORPORATION,
                        By Its Attorneys,

                        /s/ William L. Boesch
                        Anthony M. Doniger, BBO No. 129420
                        William L. Boesch, BBO No. 558742
                        SUGARMAN, ROGERS, BARSHAK
                         & COHEN, P.C.
                        101 Merrimac Street
                        Boston, MA 02114
                        617-227-3030

## CERTIFICATE OF SERVICE

I hereby certify that this document is being filed through the ECF system, and that I am therefore relying on the system to complete service by sending copies of the filing electronically to the necessary counsel, who are registered participants.

                        /s/ William L. Boesch

393499.4