UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VISIBLE SYSTEMS CORPORATION,<br><br>Plaintiff<br><br>v.<br><br>UNISYS CORPORATION,<br><br>Defendant | Civil Action No. 04-CV-11610-RGS |

**PLAINTIFF'S  MOTION FOR INJUNCTION, DECLARATORY RULINGS
BASED ON JURY VERDICT, AWARD OF PROFITS, AND ATTORNEYS FEES**

Plaintiff Visible Systems Corporation ("Visible") makes the following motions based on the jury verdict as well as the trial exhibits and other documents of record in this action, and respectfully requests the Court to enter judgment accordingly.[1]

**I.  Plaintiff Moves for a Permanent Injunction to Prevent Infringement of Plaintiff's Marks**

Plaintiff is entitled to an injunction to prevent Defendant Unisys Corporation ("Unisys") from infringing Visible's marks in the fields in which those marks have been registered and used:

1.  VISIBLE service mark for Consulting Services in the field of Information Technology, and Training in the field of Information Technology.

2.  VISIBLE trademark for Computer Programs for Database and Application Development, including Configuration Management, Data Warehousing, Object, Data, and Process Modeling, including data flow diagrams and entity relationship diagrams.

3.  VISIBLE SYSTEMS trademark for Computer Programs recorded on magnetic disks.

---

[1]     The status of counsel conferences is as follows:  On July 31, 2007, Unisys' counsel undertook to confer with their client about the mediation proposed by Plaintiff.  Since then nothing further has been heard.

As stated in its complaint, Visible seeks an injunction against the use of 3D VISIBLE ENTERPRISE and any other mark confusingly similar to the VISIBLE marks set forth above, by Unisys and persons acting in concert with Unisys.

Accordingly, Visible proposes a form of injunction, attached hereto as Exhibit 1, that forbids Unisys to use any and all marks that include the term "Visible." Because Unisys has used "3D-VE" widely as an easily-recognized abbreviation of the infringing mark "3D Visible Enterprise," the proposed injunction forbids the use of "3D-VE." Also, because Unisys has added to the confusion by using many capitalized headings with "Visible" including Visible Breakthrough, Visible Metrics, and Visible Results, in association with the marketing of 3D Visible Enterprise and modeling, the proposed injunction forbids the use of all advertising, marketing phrases, or slogans that include "Visible."

In order to prevent Unisys' infringements from creating a new descriptive use of the word "visible" that was not found in the market for modeling products and services before Unisys' infringements began, the proposed injunction forbids the use of "visible" in connection with enterprise architecture modeling services or products. This prophylactic measure is amply justified by the failure of Unisys to identify and introduce at trial any instances of "visible" used as a descriptive term in the modeling market prior to the commencement of Unisys' infringements on June 17, 2004. This measure also prevents Unisys from continuing to benefit from its extensive Visible Enterprise and Visible Commerce advertising by simply changing capital "V"s to lowercase "v"s in contexts that are not *bona fide* descriptive uses of language.

The proposed injunction is limited to materials distributed in or readily accessed by persons in the United States. This includes, naturally, all Unisys websites that are accessible by persons in the United States. *See Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 939 F. Supp. 1032, 1035 (S.D.N.Y. 1996).

The proposed injunction allows Unisys a period of 30 days to deliver infringing materials for destruction and to report back to the Court as to its compliance.

## II. Based on the Jury Verdict, Plaintiff Moves that Defendant's Counterclaim Be Denied.

Unisys' amended answer and counterclaim, Docket No. 26, at 9, requests the Court to order the cancellation of Plaintiff's VISIBLE marks as merely descriptive, pursuant to 15 U.S.C. § 1119. The jury found the Visible marks distinctive, not descriptive, and thus protectible. Therefore, the Court should deny Defendant's counterclaim and adjudge the VISIBLE marks good and valid in law.

## III. Based on the Jury Verdict, Plaintiff Moves that Unisys' Mark "3D Visible Enterprise" Be Adjudged Non-Registrable and Unisys' Application Therefor Be Cancelled.

Unisys' attempt to register the mark "3D Visible Enterprise" has been on hold, under challenge before the Trademark Trial and Appeal Board, pending resolution of this action. Since the jury found specifically that Defendant's use of "3D Visible Enterprise" infringes Visible's marks, the Court should grant Prayer F of the Amended Complaint at 15, by entering judgment that "3D Visible Enterprise" is non-registrable as a mark and that Unisys' application therefor is subject to cancellation.

## IV. Based on the Jury Verdict, a Supplemental Jury Trial Is Appropriate to Determine an Award of Defendant's Profits

The jury's finding of willful infringement, together with the strong evidence of competition as to both modeling tools and modeling services, as well as jury instructions concerning competitors and a preliminary determination as to same or similar products and services -- transcript 7-31-07 at 102, 107, 109 -- call for an award to Plaintiff of the profits Unisys wrongfully gained through its infringing sales of modeling tools and consulting services under the "3D Visible Enterprise" name.

Visible urges on the Court, as it did during trial, that an award of defendant's profits, pursuant to 15 U.S.C. sec. 1117(a), is a matter of statutory damages to be decided by the jury. *See Daisy Group,*

*Ltd. v. Newport News, Inc.*, 999 F. Supp. 548, 551 ( S.D.N.Y. 1998); *Ideal World Marketing, Inc. v. Duracell, Inc.*, 997 F. Supp. 334, 336 (E.D.N.Y. 1998); *Alcan International Ltd. v. S.A. Day Manufacturing Co.*, 179 F.R.D. 398 (W.D.N.Y. 1998); *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 629 F. Supp. 644 (D. Me. 1986), *reversed and remanded on other grounds*, 811 F.2d 26 (1st Cir.), *cert. denied*, 483 U.S. 1013 (1987).

To be sure, an equal number of district courts have gone the opposite direction, treating trademark disgorgement as equitable and thus reserved to the court. *See, e.g., Juicy Couture, Inc. v. L'Oreal USA, Inc.*, 2006 US Dist. LEXIS 9154 (S.D.N.Y. March 7, 2006); *Coca-Cola, Co. v. Wright*, 55 F.R.D. 11 (W.D. Tenn. 1971).

Remarkably, no appellate decision has yet addressed this question.  The district court in *Tamko Roofing Products Co. v. Ideal Roofing Co.* made a bench decision as to infringer's profits following on the jury's findings of willful infringement and direct competition, and the Court of Appeals affirmed without discussion of judge vs. jury as decisionmaker on this issue.  282 F.3d 23 (1st Cir. 2002).  By contrast, the district court in *Attrezzi* instructed the jury on a special verdict question as to disgorgement, but the jury did not award any portion of defendant's profits, and once again the First Circuit did not have occasion to address the issue of judge vs. jury on appeal. *See* Plaintiff's Proposed Jury Instructions at 116, 118; *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32 (1st Cir. 2006).

Preserving the right to jury trial on this issue would comport with three important considerations.  First, the remedies section of the trademark statute treats both direct damages and infringer's profits in the same section on monetary damages, 15 U.S.C. sec. 1117(a), making this a unitary issue of statutory damages, not a particular remedy arising only in equity.  Second, the Supreme Court's decision in *Dairy Queen, Inc. v. Wood* upheld the right to jury trial in a claim that

could be construed either as contract damages or trademark disgorgement damages. The Court

affirmed the right to jury trial in all such cases unless the accounting of profits is too complex for

the jury to undertake. *See* 82 S.Ct. at 899; *id.* at 901 (Harlan, J., concurring). Third, since jury

trial is a right under the Constitution, any doubt as to this admittedly close issue should be

resolved in favor of trial by jury.

## V. The Appeal of Magistrate Judge Bowler's Decision of July 12, 2007 Bears Significantly on Defendant's Degree of Culpability and the Vulnerability of Its Profits

Plaintiff's appeal of Magistrate Judge Bowler's decision of July 12, 2007, made within 10 days

under the Federal Rules on July 25, 2007, Transcript 7-25-07pm at 170, involves the following matters

that would be material to a trial:

(a) The re-deposition of Unisys' former corporate designee David Wright as to the

circumstances of his dismissal one week after his Rule 30(b)(6) deposition. Were a fact-finder to infer

that his unusual layoff was a retaliatory discharge for testimony that shed light on Unisys' willfulness

and motive for infringement, this would be relevant to issues of disgorgement of profits, bad faith, and

contumacious behavior.

(b) The re-deposition of Unisys' CEO Joseph McGrath, also relevant to the above-stated issues.[2]

(c) The opportunity to discover emails identified by David Wright and not yet produced by

Unisys, material to willfulness of infringing conduct by the company. This opportunity would arise if

the discovery sanctions sought by Plaintiff were imposed by the Court.

(d) A re-inspection of emails reflecting attorney advice, as the *in camera* review was influenced

by Unisys' representation at the hearing of June 28, 2007 that Unisys would not rely on an advice of

counsel defense, a representation that Unisys later contradicted by making an advice of counsel defense

---

[2]     Plaintiff subpoenaed Mr. McGrath for testimony at trial, and the subpoena was quashed or disregarded on grounds
that it was served at Unisys' headquarters beyond 100 miles from the Court.

at trial in its opening statement, Tr. 7-23-07 at 51, and closing argument, Tr. 7-31-07 at 11 ("Their [Grey's] trademark counsel cleared it.")

**VI.  In the Alternative, if the Issue of Defendant's Profits is Reserved to the Court, the Court Should Render an Award of Profits to Plaintiff**

If the Court disagrees with Plaintiff's request in Part IV above, the Court should render an award of those profits that Unisys wrongfully gained by willful infringement of Visible's marks.  The record contains ample support for an award, as discussed in detail below.  Equitable considerations, as well as the plain wording of 15 U.S.C. § 1117(a), and controlling precedent, require an award of Defendant's wrongfully acquired profits.

First Circuit precedent holds that a trademark infringer's profits shall be awarded to the trademark owner, subject to principles of equity, when there is competition between parties offering the same or similar products or services in a market.  *See Tamko Roofing Products Co. v. Ideal Roofing Co.,* 282 F.3d 23, 36 (1ˢᵗ Cir. 2002).  An award of profits may also be justified by the need to deter willful infringement.  *Id.*  In the present case, the evidence and the jury verdict show *both willful infringement and competition.*

A.  <u>The jury found willful infringement</u>.  The willfulness verdict is based on strong facts, which when viewed in light of the verdict, show that

(1)  Plaintiff had invested over $2 million in developing the Visible name and reputation in the modeling market over a 20-year period;

(2)  Visible was the oldest name still standing in this market;

(3)  Visible had an extraordinary reputation as (a) a pioneering methodology, developed by Clive Finkelstein, the "Father of Information Engineering," a discipline whose popularizer, James

Martin, was openly emulated by Unisys (Trial Ex. 72 at 1144 and 1156); and (b) a modeling toolset that was renowned as easy to learn and easy to use (Trial Ex. 20);

(4) Unisys was a company that badly needed everything the Visible name stood for: Unisys was an "old-line mainframe maker" that was "struggling to be viewed as much more of a consulting and services firm," in the words of David Wright one week before he was escorted to the door.  July 27, 2007 Transcript at 14.

(5) Over two hundred Unisys persons had documented contact with Visible, dozens of them actually receiving Visible's modeling tools, during the 15 years leading up to Unisys' infringements (Trial Ex. 130).

(6) Seeking to sanitize its infringement, Unisys presented the jury with an account of its advertising agency having conceived "3D Visible Enterprise" in total innocence, receiving not even the component terms "3D" and "Visible" from Unisys.  But this story was dramatically rebutted by the deposition testimony of Unisys' own CEO, who admitted the authenticity of a video from the Internet in which he and an entire audience donned 3D glasses to watch the three-dimensional modeling capabilities of Unisys in a 3D animated video, and in which the CEO used the term "visible" in connection with modeling.  (Transcript 7-31-07 at 6-7).  This video, moreover, was viewed by the advertising firm in developing the name 3D Visible Enterprise (Ex. 164, at 5-6).

(7)  Unisys had been in the modeling/CASE (computer-aided software/systems engineering) market for many years with its Linc/EAE/Agile Business Suite development environment and modeling tools (Ex. 131), *see* testimony of Unisys CTO Fred Dillman, Transcript 7-27-07 at 109-114, 124.

Thus, examining the facts in light of the jury verdict, this was a case of a long-time participant in a market appropriating the oldest and best name in the market in order to do a much-needed makeover

of its corporate image.  Trademark law and judicial precedent require that profits of such unlawful

conduct be paid over to the trademark owner whose rights have been infringed.

B.  <u>The jury verdict of infringement, in light of the jury instructions, indicates direct competition</u>.

The Court's instructions about the purpose of trademark law triply emphasized that the purpose of the

law is to protect a trademark owner against a *competitor*.  *See* Transcript 7-31-07 at 102 lines 8, 13 *and*

24.  The Court instructed the jury that they were required to make a "preliminary determination that

Visible Systems and Unisys offer the same or similar software products and consulting services," before

moving to the eight-factor test for likelihood of confusion.  *Id.* at 107.  In the eight-factor test, the Court

instructed that "you should also consider whether the companies are competitors in any meaningful

sense."  *Id.* at 109.

The jury was able to find likelihood of confusion under these instructions, because  competition

was amply and conclusively demonstrated at trial.  The jury saw unrebutted evidence that Unisys' sales

of Agile Business Suite, Provision Suite, and IBM Rational modeling tools were in the same modeling

market as Visible Systems' product.  Plaintiff's expert Dr. Malcolm Lane testified that what Unisys

offers under the name 3D Visible Enterprise is "very similar" to the products and services of Visible

Systems, and that "they have very similar outputs and results for clients."  Transcript 7-26-07 at 83.  Dr.

Lane further testified that Unisys' 3D Visible Enterprise experiential workshops "do the same thing" as

Visible Systems, and that "Visible Systems can and has done the same thing" as Unisys.  *Id.* at 104-05.

The jury heard Dr. Lane's uncontested opinion that the two companies "can compete" in the modeling

consulting services market despite their disparity in size, and that the competition is especially likely in

the government sector and in relatively small engagements.  *Id.* at 108-10.

Visible's engagement for the Arizona Supreme Court fully demonstrated to the jury that Visible

provides consulting services, in a way that provides a result for the client similar to outsourcing to a large

consulting firm like Unisys.  Mr. Earl testified that the results of Visible's approach and a large consulting firm's approach are the same for the client except that Visible's approach substantially greater benefits to the client at lower comparative cost.  William Earl, Transcript 7-27-07 at 32.

**C.  Because there was willful infringement by a competitor selling products very similar to Visible's in the same enterprise modeling market, Unisys is required by federal trademark law and precedent to pay over to Visible the profits Unisys gained by willful infringement.**

Visible's burden is to show only the *revenue* of Unisys related to "3D Visible Enterprise" -- with ambiguities and uncertainties resolved against the infringer, especially to the extent the infringer's conduct created the uncertainties.  The burden is on Unisys to show the costs associated with the infringing sales, and to show, if the Court allows, specific types of revenue that are not gained in direct competition with Visible.  *See Tamko Roofing Products Co. v. Ideal Roofing Co.,* 282 F.3d 23, 36-37 (1st Cir. 2006), *citing Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.,* 316 U.S. 203, 206-07, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942).

Unisys admitted at trial that it uses "3D Visible Enterprise" as its "core differentiator" for marketing its services.  E. Raftery, Tr. 7-27-07 at 210; *see* F. Dillman, *id.* at 120.  Unisys' advertising, beginning with the 6-17-04 ad in the Wall Street Journal, has used "3D Visible Enterprise" to promote every product and service that Unisys offers.[3]  Although Raftery and Dillman denied that 3D Visible Enterprise was used to sell hardware and software, Unisys' web advertising plainly shows 3D Visible Enterprise used to market hardware such as Unisys ClearPath servers (Ex. 127), and modeling software such as Agile Business Suite (Ex. 131).

Unisys admitted at trial that it has been reselling Proforma and IBM Rational modeling tools. Unisys' counsel characterized the sales as "very few occasions" and claimed that "Unisys doesn't make

---

[3]      "Everything we do at Unisys can move you toward becoming a 3D Visible Enterprise . . ." Ex. 89 (WSJ 6-17-04), Ex. 111, Ex. 112.

any money on this," Closing Argument, Tr. 7-31-07 at 31, but Unisys never presented any substantiation or data to support these vague claims.

Unisys' 3D Visible Enterprise Experiential Workshops (Exs. 35, 70, 71, 76) are small-scale modeling engagements that are the "same thing" as consulting engagements Visible has done and does now. Testimony of Dr. Malcolm Lane, Transcript 7-26-07 at 104, 105.

Unisys' larger consulting engagements for government agencies and other enterprises are the same or inferior, in the results experienced by the customer, as compared to Visible's engagement with the Arizona Supreme Court. *See* Testimony of William Earl, Tr. 7-27-07 at 26-33; Testimony of Dr. Lane, Tr. 7-26-07 at 103-110.

The record contains the following evidence as to Unisys' revenues:

1. Total revenue related to 3D Visible Enterprise advertising (as a marketing differentiator or umbrella brand): All Unisys US revenue June 17, 2004 to date = 3.2 years x 45% (US proportion[4]) x $5.79Bn (average Unisys annual revenue 2004-06) = $8.34 billion

2. Revenue from 3D Visible Enterprise engagements: $463 million[5] in 2004 x 0.45 x 3.2

= $667 million specifically identified 3D Visible Enterprise US revenue

3. Revenue from 3D Visible Enterprise Experiential Workshops: 105 conducted and planned 3D-VE workshops in 2004;[6] more than 109 3D-VE workshops in 2005;[7] extrapolate at least 109 3D-VE workshops in 2006 and 72 3D-VE workshops in January-August 2007 = 395 total x $45,000 average revenue per workshop[8] = $17,775,000 x .45 = $8 million US Unisys revenue for 3D-VE workshops

---

[4]     Unisys' US revenues during 2004-06 were 45% of Unisys' total worldwide revenue -- *see* Unisys 2006 Annual Report, Ex. 168, p.46; Unisys 2005 Annual Report, Ex. 169, p.48; *and* Unisys 2004 Annual Report, Ex. 170, p.21.

[5]     *See* 3D-VE Financial Snapshot, Ex. 71, p.8.

[6]     *Id.*

[7]     *See* Unisys Internal Communication, "Experiential Workshops Popular With Clients," Ex. 70.

[8]     *See* Ex. 76, p. 7.

4.  Revenue from sales of modeling software including Agile Business Suite (also known as EAE and Linc), Proforma modeling tools, and IBM Rational modeling tools: Unknown, because Unisys refused to answer relevant interrogatories[9] and presented generalities with no financial substantiation at trial.[10]  The record does contain evidence that Unisys carries each year on its books over $300 million in value of "marketable software" - *see, e.g.,* Unisys 2006 Annual Report at 29 (Ex. 168).  It is Unisys' burden to show how "miniscule" its sales based on $300M of marketable software are each year.

5.  Revenue from ClearPath servers: Unknown, due to unanswered Int. No. 14.

**Unisys cost of revenue:**  Unisys objected to and failed to answer Interrogatory No. 14 concerning this issue.  Unisys' Annual Reports 2004-06 indicate cost of revenue averaging 80% of revenue for these three years (Exs. 168, 169, 170).  Thus, Unisys' profits on its 3D Visible Enterprise-related revenue should be calculated as at least 20% of revenue.

Unisys further has the burden of showing what portions of its profits, if any, are not related to competition with the products and services of Visible Systems. *See Tamko, supra,* 282 F.3d at 35-39.

**D.  The Award of Profits Should be Sufficient to Deter Infringement Without Constituting a Penalty.**

Given the presumptions and inferences favorable to plaintiff upon a jury verdict of willful infringement by a competitor selling the same or similar services and products, and given Unisys' self-inflicted handicap from having failed to answer Interrogatory No. 14, it is likely that the resulting figure

---

[9]  Specifically, Unisys objected to and did not answer Interrogatory No. 14, which asked for revenue, gross margin, and net profit figures with respect to:

a.  "sales of services and products sold bearing the name or name '3D Visible Enterprise' or '3D-VE' or any variant thereof";

b.  "sales of services and products for which '3D Visible Enterprise' or any variant thereof is used as a marketing device or marketing differentiator"; and

c.  "sales by Unisys of services or products of partners or strategic alliance participants of Unisys (as identified in Interrogatory No. 13 above) that are related to the use of the mark '3D Visible Enterprise' or any variant thereof.  *See* Response of Defendant Unisys Corporation to First Interrogatories by Plaintiff, at 10, appended hereto as Exhibit 2.

[10]  Transcript 7-31-07 at 31 (Unisys closing argument quoting F.Dillman as to "miniscule" revenue from software resales.

for defendant's profits from willful infringement in the enterprise architecture modeling market, both services and products, will be an extraordinarily large figure, without need for enhancement based on considerations of deterrence.

Plaintiff suggests that the Court bring the concept of deterrence to bear as to a determination of the just and reasonable amount of profits that should be paid over by Unisys. Considerations of deterrence are useful in ascertaining a reasonable figure sufficient to deter infringement by a company such as Unisys.

An examination of Unisys' annual reports for 2004, 2005, and 2006 (Exs. 168-170) shows that Unisys commonly and repeatedly reports to its shareholders unfortunate financial surprises and negative developments each in the multiple tens of millions of dollars. *See, e.g.,* Unisys 2004 Annual Report, Ex. 170, at 2-3; Unisys 2005 Annual Report, Ex. 169, at 1; Unisys 2006 Annual Report, Ex. 168, at 1 (reporting net loss for year of $278.7 million). Over the past three years, these reports have caused no identifiable change in senior management of the company. Thus an award of profits reduced into the range of $10-50 million would have no expected deterrent value—it would simply be one more loss of similar magnitude to many others reported by the same management. Plaintiff submits that an award of Unisys' unjustly gained profits reduced to $100 million, but not lower, would be reasonably calculated to have deterrent effect.

While district courts have substantial discretion to fashion appropriate remedies for trademark infringement, remedies must be adequate to deter willful infringement. *See, e.g., Truck Equipment Service Co. v. Fruehauf Corp.,* 536 F.2d 1210, 1223 (8th Cir. 1976) (award of 20% of infringer's profits reversed as "clearly inadequate to ensure that similar conduct will not reoccur in the future"); *International Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.,* 146 F.3d 66, 72 (2d Cir.

1998) (decision whether to award full or partial accounting for willful infringement "must be based on what is necessary to deter future misconduct.")

The First Circuit has recognized the importance of deterrence in cases of willful infringement by a competitor.  *See Tamko Roofing Products Co. v. Ideal Roofing Co.,* 282 F.3d 23, 36 (1st Cir. 2002). The First Circuit has further recognized a paramount purpose of the Lanham Act, "where the owner of a trademark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats."  *Id.* at 38.  The Supreme Court has observed that adequate damages may constitute a windfall to plaintiff, but the alternative is a "windfall to the wrongdoer."  *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.,* 316 U.S. 203, 207, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942).

**VII.  In the Alternative, if the Court Does Not Award Infringer's Profits to Plaintiff, the Jury Verdict of $250,000 Should Be Trebled Due to Willful Infringement, Need for Deterrence and Prevention of Unjust Enrichment, and the Equities of the Case.**

Such trebling of the direct damages award is expressly authorized by 15 U.S.C. sec. 1117(a)(3).

**VIII.  Based on the Jury Verdict and the Circumstances of the Litigation, Plaintiff Is Entitled to an Award of Attorneys Fees.**

Attorneys fees are to be awarded when the infringement is willful and the award is consistent with equitable considerations.  *See Tamko Roofing Products v. Ideal Roofing Co.*, 282 F.3d 23, 32 (1st Cir. 2002).  Equities in this case argue strongly for an award, in light of the strong facts underlying the jury's finding of willfulness.  *See* pp. 6-7 *supra.*  This case offers a stark contrast to *Volkswagenwerk AG v. Wheeler,* 814 F.2d 812 (1st Cir. 1987), in which the First Circuit reversed an award of attorneys fees on grounds that (a) defendant was a small local company; (b) defendant had no statutory constructive

notice of the marks because they were unregistered marks, and (c) plaintiff did not plead attorneys fees

in the complaint.

**IX. Based on the Jury Verdict, Unisys Should Be Found in Violation of the Massachusetts Consumer Protection Act.**

A claim of unfair competition under either sec. 43(a) of the Lanham Act, 15 U.S.C. sec. 1125(a),

or under the Massachusetts Consumer Protection Act, M.G.L. ch. 93A, secs. 2, 11, rests upon the same

grounds, *R.J. Toomey Company v. Toomey*, 683 F.Supp. 873, 879 (D.Mass. 1988), i.e., defendant's use

of a mark in interstate commerce likely to cause confusion or deceive purchasers concerning the source

of the goods or services at issue. *Id.*, at 876. Thus, the jury's finding that defendant has infringed

plaintiff's trademarks establishes that defendant has violated c. 93A. Furthermore, such a violation of c.

93A, sec. 2, requires that the court award the plaintiff reasonable attorneys' fees and costs. M.G.L. c.

93A, sec. 11. A willful violation of sec. 2, such as found by the jury in the instant action, requires that

any award of actual damages be at least doubled and permits such award to be trebled. *Id.*

       Plaintiff VISIBLE SYSTEMS CORPORATION,
       By its attorneys,


       ____/s/Stephen H. Galebach_____
       Stephen H. Galebach, BBO # 653006
       GALEBACH LAW
       9-11 Touro Avenue
       Medford, MA  02155
       781-874-2239
       galebach@galebachlaw.com

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the

registered participants as identified on the Notice of Electronic Filing.


August 21, 2007        ____/s/ *Stephen H. Galebach*_____
       Stephen H. Galebach