UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VISIBLE SYSTEMS CORPORATION, <br><br> Plaintiff <br><br> v. <br><br> UNISYS CORPORATION, <br><br> Defendant | Civil Action No. 04-CV-11610-RGS |

## <u>DEFENDANT'S MEMORANDUM ON POST-TRIAL MOTIONS</u>

Defendant Unisys Corporation submits this memorandum (1) in support of its renewed motion, filed herewith, for judgment as a matter of law under Fed. R. Civ. P. 50(b); and (2) in opposition to the motion by plaintiff Visible Systems Corporation ("VSC") seeking entry of a judgment, comprising an injunction and other relief, based on the jury verdict.[1]

As argued below, the jury's verdict was not based on sufficient evidence. First, the evidence failed to support any rational conclusion that Unisys's use of the 3D VISIBLE ENTERPRISE mark has created a likelihood of confusion among any relevant group of consumers. Second, the evidence did not rationally support the jury's award of damages, which can only be regarded as arbitrary or speculative. Third, there was no sufficient evidence to support the jury's finding of willfulness—which conflicts with the Court's pre-trial ruling that Unisys adopted its mark in good faith.

For these reasons, the Court should enter judgment as a matter of law in favor of

---

[1] "Plaintiff's Motion for Injunction, Declaratory Rulings Based on Jury Verdict, Award of Profits, and Attorneys Fees," Document No. 118.

Unisys, notwithstanding the jury's verdict, pursuant to Fed. R. Civ. P. 50(b).  A ruling in favor of Unisys on this basis would, obviously, render moot VSC's request for entry of a judgment in its favor based on the jury verdict.  Furthermore, as argued below, VSC has unclean hands, and is not entitled to any equitable relief.  But assuming *arguendo* that the Court were to reach the merits of VSC's motion, the request for an injunction is overbroad and ill-conceived.  The Court should instead, if it issues an injunction, adopt the form proposed herewith by Unisys.[2]  There is also no basis for plaintiff's demand for a disgorgement remedy, as the Court has already correctly ruled—nor any justification for a "supplemental trial" on this issue.  Nor is there any ground for multiple damages or attorneys' fees.

**I.      The jury could not have rationally concluded that VSC's potential customers are likely to be confused by Unisys's mark**

> **A.      The evidence showed that the relevant consumers are extraordinarily sophisticated, and that the buying process is careful and deliberate**

The test for the likelihood of confusion in this case is whether a reasonably prudent potential consumer of VSC's goods or services, first, would be exposed to Unisys's 3D VISIBLE ENTERPRISE mark; and, second, while exercising ordinary care in making a decision about whether to purchase VSC's goods or services, would likely be confused, mistaken or deceived into believing that Unisys's mark suggests a relationship with VSC.[3]

In any trademark case, this probability is naturally very dependent on context—in particular, the identity of the relevant population of potential consumers, and the

---

[2]  *See* Form of Injunction, Exhibit A hereto.
[3]  *See, e.g.,* ALI, *Restatement (Third) of the Law of Unfair Competition* ("Restatement"), § 20, Comment h at 217 (1993 and 2007 supp.).

circumstances in which they make buying decisions. Thus, numerous courts have recognized that in a case that involves professional or otherwise discriminating buyers, the standard for proof of likelihood of confusion is elevated: "[W]here the relevant buyer class is composed of professionals or commercial buyers familiar with the field," they are often regarded as sophisticated enough not to be confused even by "trademarks that are closely similar."[4] Thus, "a court called upon to assay the likelihood of confusion must ponder the sophistication of the class."[5]

As a related matter, courts have recognized that among any consumers there is always less likelihood of confusion where goods or services are expensive, and purchases are made after careful consideration. "[T]he average purchaser of an automobile," for example, "will no doubt devote more attention to examining different products and determining their manufacturer or source than will the average purchaser of a ball of twine."[6]

In this case, the evidence was overwhelming that the relevant consumer population is highly sophisticated, and makes careful and deliberative purchasing decisions based on comparison of product (and service) features. Moreover, these consumers have an intimate understanding of the industries in which they make purchases, and are careful to identify the source of what they buy. To give some examples:

---

[4]   J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition* ("McCarthy on Trademarks"), § 23:101 (4th ed. 2006).
[5]   *Int'l Assoc. of Machinists and Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr.*, 103 F.3d 196, 204 (1st Cir. 1996).
[6]   *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.*, 626 F.2d 193,194 (1st Cir. 1980). *Accord, e.g., Astra Pharm. Prod., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1206-07 (1st Cir. 1983).

- VSC witness Rainer Schoenrank

  ◊ Mr. Schoenrank is an independent computer consultant specializing in creating databases and modeling data warehouses. He has graduate degrees in computer science and systems architecture. He has previously worked as a programmer and as a senior consultant for KPMG/Peat Marwick.[7]

  ◊ Mr. Schoenrank confirmed that he is a sophisticated user and consumer of software tools. He testified about the careful process he followed that led to his selection of one of VSC's tools, after comparing it to fifteen other products (eight for a PC and eight for a Macintosh), and applying eight or nine different comparison factors. He discussed reviewing the strengths and weaknesses of modeling tools with professionals in IT departments.[8]

  ◊ Mr. Schoenrank testified that "everybody" among the programmers and consultants with whom he deals has closely followed the acquisitions and mergers that have occurred in the modeling tool markets. He himself had no difficulty reciting the history of various mergers and identifying, by current name, the current makers of particular tools. He agreed that it is important to someone in his position to make sure he understands the source of a modeling and programming tool when he makes a purchase for use on a client engagement.[9]

- VSC witness William Earl

  ◊ Mr. Earl is the "Chief Architect" for the Arizona Supreme Court Information Technology Division. He has a dual degree in computer science and mathematics, and previously worked as a consultant in the computer industry.[10]

  ◊ Mr. Earl described the decisionmaking process that led to the Arizona courts' selection of a VSC software product for a particular project. The process involved researching several companies and evaluating the strengths and weaknesses of their products. Mr. Earl then interviewed VSC before selecting its product. Mr. Earl agreed that selection of software in such circumstances is done very carefully and deliberatively, and involves sophisticated decisionmakers like him.[11]

- VSC expert witness Malcolm Lane

---

[7] Trial Transcript, July 24, 2007, at 3-5. (Citations to the trial transcript are given hereinafter in this form: "Transcript 7/24 at 3-5.")

[8] Transcript 7/24 at 7-8, 13, 19.

[9] Transcript 7/24 at 11-14, 18-19.

[10] Transcript 7/27 at 15-17.

[11] Transcript 7/27 at 23, 25, 45.

◊  Dr. Lane testified about his years of experience in the modeling industry and his teaching on the subject.[12]

◊  Dr. Lane testified about his first use of VSC's products after a careful comparison with products of competitors including ERwin and Visio.  He too was familiar with the details of mergers and acquisitions in the modeling-tool industry.[13]

- VSC witness Alan Perkins

◊  Mr. Perkins works for SRA International as a consultant in its "Enterprise Architecture Center of Excellence."[14]  He has worked with large consulting firms including IBM and PricewaterhouseCoopers.[15]  He also worked in the White House Communications Office and was head of the Army Computer School in Europe.[16]

In an environment where the relevant consumers are both so sophisticated and so attuned to developments in their industry, and in which their purchasing decisions are so careful and deliberate, it is unimaginable that these decisions would be significantly influenced by something like the use of the common word "Visible," or the casually mistaken belief that Unisys's use of the 3D VISIBLE ENTERPRISE mark is somehow intended to suggest a connection with VSC.  For this reason alone, the jury's finding of likely confusion was not rationally supported by the evidence.

> **B.**  **The absence of even a single instance of actual confusion in more than three years is compelling**

The implausibility of confusion among such sophisticated consumers was starkly illustrated by the crucial fact that, as the evidence at trial confirmed, not a single consumer has ever been confused by Unisys's mark.  As Unisys has argued, courts have regarded a trademark plaintiff's inability to come forward with meaningful evidence of

---

[12] Transcript 7/26 at 52-63, 75-77, 119-120.
[13] Transcript 7/26 at 62-64, 72.
[14] Transcript 7/25 at 40.
[15] Transcript 7/25 at 41.
[16] Transcript 7/25 at 42.

actual confusion as significant to the likelihood-of-confusion analysis, particularly where the goods or services at issue have co-existed in the same market for a substantial period of time.[17]  Here, the parties' marks have co-existed for more than three years, without, as VSC acknowledged, producing a single instance of actual confusion.[18]  This further drastically undermines any rational finding that confusion is likely.

> **C.      No one outside this litigation has ever perceived VSC and Unisys as competitors, and the evidence confirmed that the parties' products and services are significantly different**

The evidence at trial was clear that before this dispute started, neither Unisys nor VSC ever regarded the other as a competitor.  Likewise, none of the various sophisticated market-research organizations who study and report on the subject have ever identified Unisys and VSC as operating in the same market segment or line of business.[19]  Indeed, there was no evidence presented at trial that anyone outside this litigation has ever considered the companies to be even potential competitors.

Even VSC's own expert witness, Malcolm Lane, while speculating at great length about scenarios in which VSC and Unisys *might* hypothetically compete in the future, effectively conceded that they have never yet done so, and that VSC will never compete for large consulting engagements of the sort Unisys conducts under the 3D VISIBLE ENTERPRISE mark.  Dr. Lane testified:

---

[17]  *See, e.g., Alta Vista Corp, Ltd. v. Digital Equip. Corp.*, 44 F. Supp. 2d 72, 78-79 (D. Mass. 1998) ("Given that the parties have been using a nearly identical name *for two and a half years*," showing of two instances of actual confusion was "rather insubstantial," even when taken in the context of plaintiff's relatively small customer base. "More telling is that the confusion did not run deep"—that is, it had not affected any purchasing decisions) (emphasis added).

[18]  Transcript 7/26 at 130; Transcript 7/30 (Charge Conference) at 39.

[19]  Trial Exhibits 21-27, 102; *and see* Transcript 7/23 at 133; Transcript 7/24 at 58; Transcript 7/25 at 3-4, 11-13.

"I personally believe they can compete....  I believe Visible Systems certainly will over the next year or so, assuming they follow the strategy I've spoken with them about, enhance their capability by probably the model I just said, not through full-time employees but through consultants....  Are they going to be the consulting organization that goes into General Motors?  I don't think so, but we're talking about magnitude and size....

"Is the magnitude of consulting to the organization big enough to compete in a large company client like General Motors or Ford Motor company or whatever?  I'd have to say no, but I think in the right environment they definitely could go head to head and compete....

"... I think it really comes down to their ability to put together consulting teams....  That's going to have to be a decision they make that I could never make....  [I]f they had to do it with the staff today, I'd have to say that it would be difficult.  If, on the other hand, they follow their vision..., I think they can compete, not so much at the large company scale but at small company scale and maybe more importantly at the government area....

"... So I think in the government market, it's probably more likely where they can go head to head....  It just depends on the motivation of where Unisys would bid, but I'm not sitting here telling you that Visible Enterprise can compete at the large corporate level at the size of companies I just mentioned.  I wouldn't expect them to be able to do that."[20]

The critical differences, recognized by the marketplace and conceded by Dr. Lane, between the businesses VSC and Unisys are in—differences which further negate any possibility of confusion—were confirmed by the evidence as to what the two companies actually offer to their customers.  As Unisys has argued, in determining whether parties' goods or services are sufficiently similar to create a potential for confusion, courts apply an "exacting standard."[21]

---

[20]  Transcript 7/26 at 105-10.

[21]  *See Alta Vista*, 44 F. Supp. 2d at 77; *Pignons S.A. de Mecanique de Precision v. olaroid Corp.*, 657 F.2d 482, 487-88 (1st Cir. 1981); *USTrust v. United States Trust Co. of N.Y.*, 210 F. Supp. 2d 9, 27, *amended in unrelated part*, 218 F. Supp. 2d 15 (D.

Here, the evidence made clear that whatever its aspirations to provide "consulting" services of some kind (or more accurately, on VSC's own account, services to enable a customer to do without consulting), VSC is principally a software company. The great majority of VSC's revenues have always come, and continue to come, from software sales.[22]  Furthermore, as noted, VSC itself took great pains at trial to point out the fundamental differences between its approach to services and that of a consulting firm such as Unisys.[23]

At the same time, despite VSC's efforts at trial (and in its motion) to paint Unisys as a "re-seller" of modeling tools, the evidence—in particular, the detailed testimony of Unisys chief technology officer Fred Dillman—revealed a very different picture.  As part of Unisys's long-established business of selling and supporting large "mainframe" computers, the company has periodically developed proprietary software to support these systems, and sells the software to its mainframe customers.  But there is no general "market" for these products; neither VSC nor any other putative competitor sell them. And they are in a separate part of Unisys's business from the consulting services provided under the 3D VISIBLE ENTERPRISE mark.[24]  In the now-predominant consulting part of the business, what Unisys "sells" is its deep expertise and experience in particular technology and business "domains".  To support its work, Unisys uses commonly available software "tools" for modeling, code generation, document

---

Mass. 2002).

[22]  *See* Trial Exhibit 62 (VSC Income Statements); Trial Exhibit 156 (Summary of Consulting Revenues).

[23]  *See, e.g.*, Transcript 7/25 at 46:3-25 (Alan Perkins testifying that VSC's approach was based on an "entirely different idea" from those of consulting firms); Transcript 7/27 at 23-27, 30-33 (William Earl testifying that there is "no comparison" between VSC's approach and those of consulting firms).

[24]  *See* Transcript 7/27 at 65-66.

development, and other tasks.[25]  The company has naturally developed preferences

among the tools on the market, and has negotiated purchasing agreements with suppliers

of what it deems the best available tools.[26]  But Unisys is also "tool agnostic," meaning

that it can perform its work using any available tools that a client may prefer.[27]  Unisys

has on rare occasions "built" its own customized tools to support its consultants' work,

and it has also occasionally been required by a client contract to act as seller (typically

with no price markup or profit to Unisys) for third-party software tools being acquired by

the client.[28]  But Unisys is not in the business of selling such tools, a fact uniformly

recognized by the independent market-analysis firms identified at trial.[29]

The clear evidence that VSC and Unisys are simply not competitors in any

realistic sense of the word further exposes the infirmity of the jury's finding that

confusion is likely.

> **D.   The evidence made clear that Unisys mark, on its face and in the context where it is actually encountered, is not confusingly similar to VSC's mark**

Unisys's 3D VISIBLE ENTERPRISE mark would, quite simply, "be hard to

confuse" with VSC'S VISIBLE mark.[30]  The reasons, confirmed in the evidence at trial,

---

[25]  Transcript 7/27 at 58-59.

[26]  Transcript 7/27 at 59-64.

[27]  Transcript 7/27 at 64.

[28]  Transcript 7/27 at 67-70, 87.

[29]  *See, e.g.*, Transcript 7/27 at 72 ("... We never just sell IBM software.").  VSC's motion refers, without citation, to supposed evidence that Unisys sells "Agile Business Suite" (previously known as "Linc" and "Enterprise Application Environment") in competition with VSC.  But Mr. Dillman made clear that Agile Business Suite is not a modeling tool, but rather an example of proprietary software developed by Unisys specifically for its hardware clients (*see* Transcript 7/27 at 110-11), and there was no evidence that VSC has ever marketed or sold competing software suitable for use on proprietary Unisys hardware, or conceivably could do so.

[30]  *See Alta Vista*, 44 F. Supp. 2d at 76.

are manifold:

- Unisys and VSC do not use any similar typefaces, backgrounds, or other visual cues to similarity.[31]

- The Unisys mark contains the element "3D," which VSC has never used for any purpose.

- While VSC has used the term "Enterprise" in other contexts, it has never used "Visible Enterprise" as a trademark—and began prominently using this combination of words only after this litigation began.

- By juxtaposing "3D" and "Visible," Unisys clearly emphasizes the conceptual power of the idea of visibility, and makes no suggestion that the word "Visible" itself should be understood as referring to the source of a product or service.

- Unisys typically uses 3D VISIBLE ENTERPRISE in conjunction with the distinctive Unisys name and logo.

- Unisys uses 3D VISIBLE ENTERPRISE to denote a *client organization's aspiration or goal* of making its operations transparent to, and understandable and traceable by, its decisionmakers, not as the name of a product or service.

- Again, Unisys frequently utilizes the abbreviation "3D-VE," lessening the connection to the particular term "Visible."

- The parties' websites provide readily available and detailed information about their respective goods and services, further obviating any potential confusion as to whether the companies are connected.

The lack of facial similarity between the marks is still another reason why the jury could not have rationally concluded that confusion is likely.

### E.    The companies market and sell their offerings in different ways

Aside from the unremarkable fact that both companies (along with much of the rest of the business world) use the internet to promote their goods and services, the evidence showed that Unisys and VSC have almost nothing in common in the way they market and sell their offerings.  Whereas VSC has in the past advertised in technical

---

[31] *Compare, e.g.*, Trial Exhibit 126 (VSC Website Home Page) *with* Trial Exhibits 111-14 (Unisys Advertisements).

publications and at trade shows, and also offered promotional copies of its software to

students,[32] Unisys's advertising of its consulting services has been in general-business

publications such as the Wall Street Journal.[33]  VSC utilizes its website (and a toll-free

telephone number listed on the home page) as a primary vehicle for promoting and

selling downloads of its software products.  By contrast, Unisys's consulting

engagements are the product of extensive, individualized and substantive relationships

with clients and Unisys's deep expertise in particular business and technology

"domains."[34]

This factor too must be counted against any rational finding that confusion is

likely.

### F. The evidence showed no "saturation" of the marketplace or "overwhelming" effect on VSC's reputation, as is required in a reverse-confusion case

As Unisys has previously argued, a claim of infringement based on a reverse-

confusion theory necessarily begins with a showing that the defendant "junior user" of

the disputed trademark—here, Unisys—has advertised and promoted its mark in a way

that "saturates the market and overwhelms the [plaintiff] senior user"—here, VSC.[35]

"When the facts vary from that model, the reverse confusion rule is not applicable."[36]

In this case, VSC offered no evidence that any such thing has occurred.  There

was no evidence that Unisys's promotion of 3D VISIBLE ENTERPRISE has been of

---

[32]  *See* Transcript 7/23 at 110; Trial Exhibits 7-14, 16-19, 47-50, 56.

[33]  *See* Trial Exhibits 89-90.

[34]  *See, e.g.*, Transcript 7/27 at 88-89, 97-101.

[35]  *See* McCarthy on Trademarks, § 23:10 at 42.

[36]  McCarthy on Trademarks, § 23:10 at 54.  *And see, e.g.,* Restatement, § 20, Comment f at 214-15 (Reverse confusion may occur where "the subsequent user's promotion of the mark... so overwhelm[s] the use by the prior user that most purchasers come to associate the mark with the subsequent user.").

such an overall nature or scale—or so intensively targeted to what VSC calls "the modeling market"—that large numbers of VSC's current and potential customers are likely to have seen and formed an impression of Unisys's mark, setting the stage for their confusion when they encounter (or re-encounter) VSC's products, and "overwhelming" or "swamping" whatever goodwill or reputation VSC's mark had previously garnered.

Indeed, the evidence VSC offered at trial was designed to demonstrate the commercial strength of its VISIBLE mark among relevant potential consumers.[37]  In a reverse-confusion case, as the Court has previously recognized, such evidence weighs *against*, not in favor of, a likelihood of confusion.[38]  And on the evidence at trial, the VISIBLE mark remains as prominent as it ever was, notwithstanding the presence of Unisys and 3D VISIBLE ENTERPRISE.  An Internet user conducting a Google search for the term VISIBLE, as was shown by demonstration at trial, would find VSC's website as the number one entry, with not a single mention of Unisys anywhere in the vicinity.[39]

Because VSC failed to show that this case fits the market-saturation-and-domination model necessary for a reverse-confusion claim, even if there had been evidence that the parties' businesses or advertising overlapped, the jury could not have properly considered this evidence as supporting a finding of likely confusion.

---

[37]  *See* Trial Exhibits 62-64 (reports showing advertising expenses); Transcript 7/25 at 112:21-25 (testimony about advertising spending); Trial Exhibits 7-11, 13, 14 (sample advertisements); Trial Exhibit 88, Transcript 7/23 at 81:16-18 (testimony identifying customers); Trial Exhibits 47-50 (trade show participation); Trial Exhibits 87-88 (sample website pages); Trial Exhibits 79-84 (VSC's newsletters); Trial Exhibit 86 (video of news segment about VSC); Trial Exhibit 30 (VSC's efforts to protect against other infringers); Transcript 7/25 at 16:17-22 (same).

[38]  McCarthy on Trademarks, § 23:10 at 49 (citing *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 231 (3d Cir. 2000)).

[39]  *See* Transcript 7/25 at 20-23.

**G.**   **The word "visible" has an important descriptive function, which further cuts against any likelihood of confusion**

As Unisys has argued, trademark law seeks to prevent the appropriation by trademark owners of useful descriptive words in ways that would "limit the ability of other sellers to emphasize the characteristics of their own goods, services or business."[40] "Language, even in a commercial context, properly belongs to the public unless Congress instructs otherwise."[41]   In this case, leaving aside the separate question of what presumptive rights VSC may have acquired by virtue of its trademark-registration history, the evidence at trial showed that the term "Visible" as used to refer to VSC's products (and services) is likely to be understood by relevant consumers as describing a key claim about their qualities or characteristics: that the tools enable a user to *see* and *understand* something.  The literal meaning and ordinary usage of "visible" and "visibility" encompasses not only the mere physical act of seeing but also the mental acts of perceiving and comprehending.  Indeed, the evidence at trial showed that this was exactly why VSC adopted the term in the first place: for its concrete descriptive power.[42]

Because potential consumers are likely to perceive the term "visible" in its descriptive sense, rather than as a necessary indicator that VSC is the source of the goods or services in question, the potential for trademark confusion is rendered even more

---

[40]   *See* Restatement, § 14, Comment a at 121.

[41]   *See Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 215 (Stevens, J., dissenting) (citing, *inter alia*, *Bada Co. v. Montgomery Ward & Co.*, 426 F.2d 8, 11 (9th Cir. 1970); *Canal Co. v. Clark*, 80 U.S. 311, 323-24 (1871)).

[42]   *See, e.g.*, Trial Exhibit 159 (VSC's website asserting, "We strive to make your business and software processes 'visible.'"); Transcript 7/23 at 126-28 (VSC founder and CEO George Cagliuso testifying that "Visible" was chosen because the company's products "convey[] knowledge.")

remote.[43]

### H.   Unisys acted in good faith, without intent to cause confusion, as the Court ruled was undisputed

One of the factors to be considered in assessing the likelihood of confusion is whether the defendant intended to cause confusion.[44]  While the logical connection has been criticized as weak, the premise is that if the defendant intended to confuse the public, this makes it at least somewhat more likely that he succeeded.  "As the Sixth Circuit has observed, intent to confuse customers gives rise to an inference of likely confusion because 'a defendant who purposely chooses a particular mark because it is similar to that of a senior user is saying, in effect, that he thinks that there is at least a possibility that he can divert some business from the senior user—and the defendant ought to know at least as much about the likelihood of confusion as the trier of fact.'"[45]

In this case, however, the Court ruled at summary judgment that this element weighed in favor of Unisys as a matter of law, since there was no such evidence of bad intent on the part of Unisys.[46]  This ruling was confirmed in response to a motion *in limine* by Unisys on the subject, and later during the charge conference, just before the close of the evidence.[47]  Thus, as a matter of law this factor too demonstrates the lack of

---

[43]  *See*, *e.g.*, *Colt Defense, LLC v. Bushmaster Firearms, Inc.*, 2005 WL 2293909, at * 28 (D. Me. Sept. 20, 2005) (weakness of mark weighs against finding of likelihood of confusion).

[44]  *See*, *e.g.*, *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 39 (1st Cir. 2006).

[45]  McCarthy on Trademarks, § 23:110 (quoting *Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568 (6th Cir. 1987)).

[46]  *See* Summary Judgment Hearing Transcript (3/29/07) at 42 ("[T]here is no evidence offered that the defendant, Unisys, adopted [its] mark in bad faith or with any intent to actually do harm to the plaintiff.")

[47]  *See* Electronic Order dated 8/7/07 allowing Docket Entry No. 99; Transcript 7/30 (Charge Conference) at 39-40.

support for the jury's finding of likely confusion.[48]

### I.   The expert testimony offered on likelihood of confusion was improper and inadequate

During the testimony of VSC expert witness Malcolm Lane, VSC's counsel asked

Dr. Lane whether he had an opinion about whether purchasers of modeling tools and

services are likely to be confused by the 3D VISIBLE ENTERPRISE mark into

mistakenly believing that Unisys has a business relationship with VSC.  Over objection,

Dr. Lane initially responded by referring to statements he had made in his expert report,

which was not in evidence.  The following exchange then occurred (with objections

omitted here for clarity):

> "MR. GALEBACH: Is it your opinion that such persons, prospective purchasers would therefore be confused?
>
> DR. LANE: Potentially.
>
> MR. GALEBACH: Are they likely – is it likely that persons who are customers or potential customers of Visible Systems will be confused?
>
> DR. LANE: Certainly.... Those people who come into my class who were familiar with Visible Systems and all the products, in particular Visible Analyst, would have that probably same assumption I would have.  In this world of mergers it just makes sense...."

Dr. Lane then proceeded to provide an analogy based on what he perceived to be IBM's

motivations and strategy in acquiring the software company Rational and using its

name.[49]

This opinion testimony should not have been admitted, and even if allowable

could not provide rational support for a likelihood-of-confusion finding.  As Unisys

---

[48]   Nor is this conclusion altered by the jury's answer to the verdict question concerning "willfulness," discussed further below.

[49]   Transcript 7/26 at 118-20.

argued in its motion *in limine* on the subject, no witness, including an expert, is competent to testify about what another person thinks, believes, understands or perceives.[50]  In a trademark case, an expert may present competent survey evidence concerning, for example, whether a relevant group of consumers associate a name at issue with a particular source of goods or services.[51]  But no such survey was conducted in this case.  And the fact that Dr. Lane may be experienced in technical fields where VSC's software is used did not qualify him to testify as an expert with respect to the associations of the word VISIBLE in the minds of relevant consumers, the reputation of plaintiff's mark, the likelihood of confusion, or any other state-of-mind issue.[52]

Nor was Dr. Lane's testimony based on any reliable scientific or other methodology.[53]  Indeed, the only "methodology" to which he referred was a supposed understanding of the thoughts of "people who come into my class," and a baldly speculative and immaterial analogy to supposed decisionmaking by IBM about its trademarks.  The lack of reliability of this reasoning was particularly stark when set against the obvious sophistication and deliberativeness of the relevant consumers who actually testified at trial, and the complete absence of any actual confusion among these or any other relevant consumers.

For these reasons, the testimony of Dr. Lane cannot be deemed to provide any rational basis for the jury's finding of likely confusion.

---

[50]  *See, e.g., Buckmaster v. Wyman*, 2006 WL 1785845, at *3 (E.D. Wis. June 23, 2006).

[51]  *See, e.g.,* McCarthy on Trademarks § 32:158.

[52]  *See, e.g., Colt Defense LLC*, 2005 WL 2293909, at *3-4 (plaintiff's expert not qualified to testify about association or reputation of plaintiff's mark).

[53]  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-94 (1993).

**J.      Conclusion: there was no basis for the jury's finding on likelihood of confusion**

As the foregoing discussion makes clear, there was no sufficient evidence to support the jury's finding that relevant consumers are likely to be confused by Unisys's 3D VISIBLE ENTERPRISE mark.  Therefore, the Court should enter judgment in favor of Unisys notwithstanding the verdict.[54]

**II.      There was no sufficient basis for the jury's award of damages**

As Unisys has argued, in a trademark case there is "a clear distinction between the showing required to establish a right to injunctive relief and that required to establish a right to damages."[55]  The standard for a monetary remedy is "considerably higher... than the mere likelihood of confusion" necessary for an injunction.[56]

Based on the evidence presented at trial, there was no adequate evidence to support the jury's award of $250,000 in damages—either as "lost profits" or based on claimed harm to VSC's goodwill.  The absence of evidence, and the amount of the award, leads inevitably to the conclusion that the jury's decision on this point was simply arbitrary or speculative.

**A.      There was insufficient evidence to show that Unisys has caused VSC to lose sales and, as a result, profits**

A claim for damages in a trademark case, as in any case, requires proof both of

---

[54]   Unisys reserves its right to seek, within 10 days after entry of judgment and pursuant to Fed. R. Civ. P. 59, a new trial in this matter on the ground that the jury's finding of likely confusion, as well as its award of damages and its finding of willfulness (see discussion below), were contrary to the clear weight of the evidence.

[55]   *See Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 999 F.2d 1, 5 (1st Cir. 1993).

[56]   *See Eckel Indus. v. Primary Bank*, 26 F. Supp. 2d 313, 317 (D.N.H. 1998).

actual harm and causation.[57]  That is, VSC was required to show both (1) that Unisys's

use of the 3D VISIBLE ENTERPRISE mark created actual consumer confusion, and (2)

that VSC suffered an economic injury as a result—that is, has lost sales to Unisys

because of the confusion, or suffered other harm to its goodwill or reputation.[58]  "To

show actual harm, plaintiff must show both that the defendant's deceptive act created

consumer confusion and that the plaintiff's injury was caused by consumer reliance on

the misleading act."[59]

The evidence VSC offered could not support a rational conclusion that this has in

fact occurred.  As noted, VSC expressly conceded that there is no evidence in this case of

even a single instance of actual consumer confusion.[60]  This alone precludes any recovery

of damages.  Likewise, there was no evidence at trial that any customer ever—for any

reason—purchased any services (or goods) from Unisys instead of purchasing

comparable goods (or services) from VSC, much less that any such purchasing decision

was ever made because of Unisys's use of the 3D VISIBLE ENTERPRISE mark.  Nor

was there any evidence that any potential customer declined to purchase VSC's products

(or services) because of a lowered estimation of VSC's reputation somehow stemming

from Unisys's use of the 3D VISIBLE ENTERPRISE mark.

Furthermore, the evidence showed that VSC's annual revenues have been steadily

declining since 2001, long before Unisys's alleged infringing activities began:[61]

---

[57]  *See, e.g.*, *Electrolux,* 999 F.2d at 5.
[58]  *See, e.g.,* McCarthy on Trademarks, § 30:74 (2006) ("Courts require that a recovery of damages [be based on] proof that some consumers were actually confused or deceived.").
[59]  *Eckel*, 26 F. Supp. 2d at 317.
[60]  *See* fn. 18 *supra.*
[61]  *See* Trial Exhibit 160.

| Year | Total Revenue | Change from Prior Year |
|------|--------------:|-----------------------:|
| 2000 | $3,970,907 | NA |
| 2001 | 3,024,721 | -24% |
| 2002 | 1,828,604 | -40% |
| 2003 | 1,807,922 | -1% |
| 2004 | 1,730,074 | -4% |
| 2005 | 1,590,925 | -8% |
| 2006 | 1,414,125 | -11% |

VSC sought to avoid the weight of this evidence by arguing, for the first time at trial, that its *quarterly* and *average monthly* revenues declined in the months immediately after June 2004.  Simply because this temporary revenue decline supposedly occurred, VSC argued, it is reasonable to conclude without any other evidence that the trend was attributable to Unisys's launch of the 3D VISIBLE ENTERPRISE mark.[62]

But the very data on which VSC relied clearly showed that any "trend" in monthly (or quarterly) revenues in the summer of 2004 merely duplicated similar or identical trends in previous periods:[63]

---

[62]  *See* Transcript 7/31 at 86-87; Trial Exhibits 62, 155.
[63]  Graph of data shown in Trial Exhibit 62.



Thus, there was no basis on which the jury could have reasonably accepted the basic premise that VSC's revenues declined, even temporarily, after June 2004.  Likewise, the jury could not have rationally linked any trend in VSC's revenues to Unisys or the 3D VISIBLE ENTERPRISE mark.[64]  Indeed, VSC's own founder and CEO testified that there were "probably a thousand reasons" why VSC's revenues declined.[65]

Moreover, even if it could have shown that it lost *revenues* as a result of Unisys's alleged infringement, VSC of course had the further burden of showing that this translated into lost *profits*, which burden it also failed to meet.[66]  A lost opportunity to

---

[64]  *Cf. Jeffery Chain, L.P. v. Tropodyne Corp.*, 238 F.3d 421 (6th Cir. 2000) (reversing judgment based on jury verdict where plaintiff's damages theory was based on supposed decline in sales correlating to defendant's infringement).

[65]  *See* Transcript 7/23 at 135.

[66]  *See, e.g., The Murphy Door Bed Co., Inc. v. Interior Sleep Sys., Inc.*, 874 F.2d 95, 103 (2d Cir. 1989) (collecting cases); *The Apollo Theater Found., Inc. v. Western Int'l Syndication*, 2005 WL 1041141, *11 (S.D.N.Y. May 5, 2005) (plaintiff must show not only lost revenue, but "what it would have cost to generate that revenue"); *Ushoday*

make sales does not in and of itself provide a basis for a claim of damages, since sales obviously do not always translate to profits.  Any award of damages for harm to sales must be calculated based on profits, not gross revenue.[67]  Here, the consistent historical net losses shown in VSC's own financial reports both before and after the 2004 launch of 3D VISIBLE ENTERPRISE precluded any rational finding by the jury that any hypothetical lost sales in the summer of 2004 would, if made, have necessarily translated into profits for VSC:[68]

| Year | Net Income from Operations |
|------|---------------------------:|
| 2000 | $(259,303) |
| 2001 | (512,174) |
| 2002 | (108,629) |
| 2003 | (51,552) |
| 2004 | (261,124) |
| 2005 | (160,694) |
| 2006 | (154,523) |

Here again, VSC sought to avoid the import of this evidence by arguing, for the first time at closing, that *only some* of the various cost and expense figures reported on its financial statements—specifically, only those categorized under the heading "Cost of Sales"—should be considered for purposes of the lost-profits calculation in this case.[69]

It is true in principle that a calculation of lost profits must include deductions for "variable" costs (those that would have increased if the supposedly lost sales had been

---

*Enters., Ltd. v. V.R.S. Int'l, Inc.*, 63 F. Supp. 2d 329, 341 (S.D.N.Y. 1999) (same).

[67] *The Murphy Door Bed Co.*, 874 F.2d at 103.

[68] Trial Exhibit 160.

[69] Transcript 7/31 at 87-90.

made) but should exclude "fixed" costs (those that would *not* have increased regardless of the amount of plaintiff's sales).[70]  But these distinctions require proof, not simply attorney argument.  The jury in this case had no fact- or expert-witness testimony that would have enabled it to discern from VSC's financial statements which of its costs were variable and which were fixed, much less to determine what deductions to make from the hypothetical lost sales figures.  The jury therefore had no rational grounds on which to calculate an award of lost profits.[71]

**B.     VSC waived any theory of damages based on supposed harm to goodwill, and there was insufficient basis for an award of damages on this basis**

On the fifth day of trial, as VSC prepared to rest its case, the Court asked its counsel to confirm that its theory of damages was limited to its contention that it lost sales, and as a result lost profits, during the four months following Unisys's June 2004 launch of 3D VISIBLE ENTERPRISE in the United States.  VSC's counsel confirmed that this was the sole basis for its damages claim.[72]  Unisys relied on this representation in presenting its case on damages.  VSC therefore waived any claim for damages based

_____

[70] *See, e.g., Doran-Maine, Inc. v. American Eng'g & Testing, Inc.*, 608 F. Supp. 609, 616 (D. Me. 1985).

[71] *See, e.g.,* Robert L. Dunn, Recovery of Damages for Lost Profits § 6.4 (6th ed.) ("It is the plaintiff's burden to prove all elements of expense and deduct them.  A judgment in favor of plaintiff based on gross income or calculated without proper proof of all expenses must be reversed."); *and see id.* at Ch. 7, § I ("A projection of lost profit damages will almost always require some form of expert testimony").

[72] Transcript 7/27 at 82-83 ("THE COURT: Mr. Galebach, one issue that is raised, which I've alluded to before, I understand the infringement claim, but am I right that the damages claim really depends on what the jury makes of the loss -- I'm sorry -- the loss of income that were shown, I've forgotten now the exhibit number, but is that really it?  MR. GALEBACH: Yes, Your Honor.  The [position] is the jury is entitled to infer from those four months immediately following launch of 3D Visible Enterprise the lower revenues that was corrected then by hiring an experienced salesperson.  THE COURT: I want to make sure that is the damages claim, that I'm not missing anything? MR. GALEBACH: Yes....")

on alleged harm to goodwill. Nonetheless, VSC's counsel argued in closing that the jury could award damages based not only on lost profits "but also [on] the loss of goodwill and reputation."[73]

Leaving aside whether this was proper, there was, in fact, no sufficient evidence to support an award of damages based on supposed harm to VSC's goodwill. VSC failed to show that its reputation has somehow suffered in any respect as a result of Unisys's use of the 3D VISIBLE ENTERPRISE mark, and indeed there is no reason to suppose this has occurred. There was certainly no basis on which the jury could have rationally determined the value of this business asset, and therefore no way to have reasonably assigned a figure to compensate VSC for its supposed loss.[74]

### III.    There was no sufficient basis for the jury's finding of willfulness

As noted, at summary judgment the Court ruled that "there is no evidence offered that the defendant, Unisys, adopted [its] mark in bad faith or with any intent to actually do harm to the plaintiff."[75] "Bad faith" exists where a defendant adopts a trademark that it knows it has no legal right to use, intending to "palm off" its goods or services as those of another, and/or desiring to damage a competitor or prevent legitimate competition.[76]

---

[73]  Transcript 7/31 at 90.

[74]  *See Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 401 F.3d 901, 914 (8th Cir. 2005) (vacating jury award of goodwill damages; issue should not have gone to jury absent testimony that plaintiff company was worth less because of its injury or evidence "giving a measure of, or a way of measuring, how much less"). The Court's instructions and verdict form likewise suggested that the jury could consider goodwill. *See* Transcript 7/31 at 103; Verdict Form, Question 4. But the Court indicated at the charge conference that if the jury did not accept VSC's lost-profits theory, the other evidence would support only an award of nominal damages. *See* Transcript 7/30 (Charge Conference) at 58:9-12, 59:4-16.

[75]  *See* fn. 46-47 supra and accompanying text.

[76]  *See, e.g., Packman v. Chicago Tribune Co.*, 267 F.3d 628, 643 (7th Cir. 2001); *cf. Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1558-59

Thus, implicit in the Court's ruling that there was no evidence Unisys acted in bad faith is a recognition that there has never been any evidence in this case that Unisys *knew it had no right to use* the 3D VISIBLE ENTERPRISE mark.  To the contrary, the evidence shows beyond question that Unisys has consistently had a reasonable, good-faith belief that, for all the reasons cited above, it was not (and is not) infringing any trademark rights of VSC.  Indeed, at summary judgment, the Court characterized VSC's case for infringement as "about as thin a case as I have seen."[77]  Likewise, the Court's summary judgment ruling recognized that there is no evidence Unisys ever sought to "palm off" its services as those of VSC, or to damage VSC or prevent legitimate competition.

In its jury instructions, the Court suggested (over objection) that if the jury found infringement, it should consider whether the infringement was "willful."  The Court indicated at the charge conference that it would regard the jury's finding on this point as "advisory," since it did not bear on any element of the infringement claim.[78]  The jury could find willfulness, the Court instructed, if Unisys (1) "knew of the Visible Systems mark"; (2) "either knew or was deliberately indifferent to the fact that it would infringe" the mark; and (3) "intentionally launched the '3D Visible Enterprise' campaign despite such a state of mind."[79]

To the extent the instruction gave the jury the option of finding that Unisys "knew... that it would infringe" VSC's mark, and "intentionally launched" its mark "despite such a state of mind," the instruction was inconsistent with the Court's earlier

---

(Fed. Cir. 1995); *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1288-89 (Fed. Cir. 1984); *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897 (Fed. Cir. 1998); *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 710 (Fed. Cir. 1992).

[77]  *See* Transcript of Summary Judgment Hearing (03/29/07) at 42.
[78]  *See* Transcript 7/30 (Charge Conference) at 58:24.
[79]  Transcript 7/31 at 112.

rulings, and was not supported by the evidence.  For similar reasons, there was no

rational basis for even the lesser alternative finding by the jury that Unisys "was

deliberately indifferent to the fact that it would infringe" VSC's mark, and "intentionally

launched" its mark with this state of mind.

VSC argues that the finding of willfulness was supported by a list it offered in

evidence of contacts between VSC and various Unisys employees dating back two

decades—a list the Court had previously rejected at summary judgment as insufficient to

show bad faith.[80]  None of the Unisys personnel identified on the list were offered as

witnesses, and VSC did not suggest that any of them had even a tangential role in the

decision to adopt the 3D VISIBLE ENTERPRISE mark.  Nor did VSC offer any

evidence that the employees' alleged contact with VSC was such that they would have

perceived the company as a Unisys competitor—as opposed to a supplier of software like

the many others in various markets with whom such employees might have occasion to

deal, or about whom they might for a number of reasons have a passing interest—or that

they would later have recognized a likelihood of confusion arising from Unisys's

adoption of 3D VISIBLE ENTERPRISE.  Under the circumstances, there was no basis

for imputing to Unisys any relevant knowledge about VSC or its trademark.[81]  Nor did

the trademark clearance obtained by Unisys's outside advertising firm, a copy of which

was provided to Unisys, give the company any conceivable reason to be concerned about

---

[80]  *See* Trial Exhibit 130.  The list was offered at summary judgment as VSC's
Summary Judgment Exhibit 34.

[81]  *Cf. 24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 447 F. Supp. 2d
266, 283 (S.D.N.Y. 2006) (no permissible inference of bad faith where defendant's
employees who knew of plaintiff's mark had no role in defendant's decision to use
mark).

potential infringement of VSC's marks.[82]

Much of the other supposed "evidence" of Unisys's willfulness VSC cites in its post-trial motion has nothing whatsoever to do with Unisys's state of mind (*see* VSC's Motion at 6 ("Plaintiff had invested over $2 million in developing the Visible name....")), or suggests inferences wholly unsupported by the evidence (*see id.* at 7 ("Unisys was a company that badly needed everything the Visible name stood for....")).  VSC also identifies what it supposes is a conflict in the evidence on the origins of the "3D" and "Visible" components of Unisys's mark: Grey Worldwide's Jack Aaker testified that no one at Unisys suggested the name "3D Visible Enterprise" or any of its constituent elements  to Grey as it worked on developing a new name for the blueprinting approach in the fall of 2004,[83] while Unisys CEO Joseph McGrath, whose deposition was read at trial, testified that he recalled the terms "3D" and "visible" having been used at Unisys "for some time" to describe characteristics of the company's blueprinting methodology.[84] There is, in fact, no conflict between the testimony of these witnesses, and certainly nothing from which the jury could have rationally inferred that Unisys was deliberately indifferent to VSC's trademark rights.

Accordingly, the Court should disregard the jury's finding of willfulness as lacking any basis in the evidence.

---

[82]   *See* Trial Exhibit 101.

[83]   *See* Transcript 7/27 at 174; *see also* Transcript 7/27 at 6-7 (testimony of Unisys's David Wright, offered in evidence by VSC, that no one at Unisys suggested the 3D Visible Enterprise name to Grey).

[84]   *See* Transcript 7/31 at 6-7.

**IV.     VSC's request for injunctive relief is overbroad and improper**

**A.     Because VSC has unclean hands, it is not entitled to any injunctive relief**

A party who comes to court with unclean hands is barred from seeking equitable relief, even where it establishes a claim that would otherwise entitle it to such relief.  In a trademark case, for example, a plaintiff who has itself acted in a manner designed to foster consumer confusion is not entitled to an injunction even where it has proven infringement.[85]  For example, in a dispute involving rights to use the name "Eye" in connection with tabloid newspapers, a California federal court declined to grant relief to the plaintiff because after learning of the defendant's planned use of the mark, plaintiff made new and similar use of the mark in a clear effort to emphasize and exploit the link between the two parties.[86]

Likewise in the present case, VSC's admitted adoption of the term "the Visible Enterprise" on its website and in its advertising after VSC learned of Unisys's 3D VISIBLE ENTERPRISE mark[87] represented a clear effort (albeit an unsuccessful one) to *create* consumer confusion.  At the same time, as noted, VSC admittedly knew of no instances of confusion resulting from Unisys's use of its mark—and made no effort to find this out.[88]  The inescapable conclusion is that VSC was not so much interested in avoiding consumer confusion as it was in manufacturing circumstances to support its litigation strategy against Unisys.  To award injunctive relief to such an actor would be grossly inconsistent with basic principles of equity.

---

[85]  *Metro Publ'g, Ltd. v. San Jose Mercury News, Inc.*, 861 F. Supp. 870, 880 (N.D. Cal. 1994).

[86]  *Id.*

[87]  Transcript 7/24 at 155:7-12.

[88]  *See* Transcript 7/26 at 130.

**B.      Any injunctive relief awarded should be appropriately tailored to the facts of this case**

"In trademark cases, the scope of the injunction to be entered depends upon the the manner in which plaintiff is harmed, the possible means by which that harm can be avoided, the viability of the defenses raised, and the burden that would be imposed on defendant and the potential effect upon lawful competition between the parties.... [A]n injunction is a purely remedial, not punitive, device."[89]  "Injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to plaintiffs, and courts must closely tailor injunctions to the harms that they address."[90]  A "victim" of trademark infringement "is entitled only to such protection as will eliminate the likelihood of confusion."[91]

The injunction proposed in VSC's motion is inappropriate in a number of respects:

**1.      The injunction should be limited to the United States**

Under the principle of territoriality long recognized in trademark law, a mark has a separate legal existence in each sovereign territory where it is registered and/or used. An infringement suit in a United States court is necessarily limited to adjudicating the parties' rights to use a disputed mark within the United States; it does not decide the parties' respective rights in any other country.  By the same token, while a court has *jurisdiction* to enjoin activities outside the United States where necessary to prevent harm to United States commerce, in the absence of such a United States nexus a court should

---

[89]  McCarthy on Trademarks, § 30:3.
[90]  *Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd.*, 282 F.3d 23, 40 (1st Cir. 2002) (internal citations and quotations omitted).
[91]  *Electrolux*, 999 F.2d at 4.

refrain from seeking to exert control over a party's foreign business activities.[92]

Likewise, in any case injunctive relief should be limited to the geographic market in

which the plaintiff has established exclusive rights to the disputed mark.[93]

VSC suggests that the injunction in this case should extend to "any website

accessible via the Internet from any computer in the United States"[94]—in other words, to

every one of the 33 country-specific websites Unisys maintains throughout the world,

many of them in languages other than English.[95]  This request is overbroad and improper.

In the lone decision cited by VSC, a copyright case, the infringing party's website was

operated from outside the United States, but the defendant actively solicited United States

residents to become subscribers to the site.[96]  By doing so, the court found, the defendant

"has distributed its product within the United States."  Nonetheless, the court did not

enjoin the infringing activity, but merely prohibited the defendant from continuing to

provide subscriptions to United States residents.  Here, by contrast, there is no evidence

that Unisys encourages United States users to visit its non-U.S. websites.  Nor is there

any basis for concluding that VSC has rights to the VISIBLE mark outside the United

States.  While as a practical matter it is likely that whatever corporate action Unisys takes

with respect to the 3D VISIBLE ENTERPRISE mark will be adopted worldwide, the

---

[92]  *See* McCarthy on Trademarks, §§ 29:1, 29:7, 31:15; *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 599 (5th Cir. 1985); *Osawa & Co. v. B&H Photo*, 589 F.Supp. 1163, 1171 (S.D.N.Y. 1984).

[93]  *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 132 (3d Cir. 2004) ("[T]he senior user of a common law mark may not be able to obtain relief against the junior user in an area where it has no established trade, and hence no reputation and goodwill."); *Beacon Mut. Ins. Co. v. OneBeacon Ins. Corp.*, 376 F. Supp. 2d 251, 265 (D.R.I. 2005);

[94]  Plaintiff's Proposed Judgment at 3.

[95]  *See* http://www.unisys.com/about__unisys/country.htm.

[96]  *See Playboy Enters., Inc. v. Chuckleberry Pub., Inc.*, 939 F. Supp. 1032, 1039 (S.D.N.Y. 1996).

Court should not seek to extend its injunctive power beyond United States territory.

###  2.    The injunction should permit reasonable time for compliance

An important aspect of a court's discretion in crafting appropriate injunctive relief is the power to control the timing and phasing of the defendant's compliance.  Where, as in this case, the plaintiff did not move for a preliminary injunction at the outset of the case, the court may appropriately consider this as weighing against setting an urgent timetable for removal of the infringing mark.[97]  The court may also "delay the implementation of an injunction so as to allow an infringer time to change to a different mark," or to sell off products already bearing the infringing trademark, thereby "avoid[ing] the wastefulness of extensive relabeling or trashing [of] the existing stock."[98]

Thus, in *Attrezzi*, the First Circuit upheld the district court's decision to allow the defendant twelve months to sell off existing stock bearing the infringing mark.  The court observed that the defendant was already "paying a stiff price in wasted advertising expenses," and that there was "no indication that the risk of harm to [plaintiff's] service mark is likely to increase appreciably because of the additional 12 months of [defendant's] competing use."[99]

The proposed form of injunction attached hereto as Exhibit A calls for a short period in which Unisys would, as explained in the affidavit attached as Exhibit B,

---

[97]   McCarthy on Trademarks, § 31:11; *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1543 (2d Cir.), *cert. denied*, 506 U.S. 991 (1992) (appropriate for trial court to exercise discretion to allow infringer to sell off existing inventory where plaintiff did not move for preliminary injunction).

[98]   McCarthy on Trademarks, § 31:11; *W. E. Bassett Co. v. Revlon, Inc.*, 354 F.2d 868, 872-73 (2d Cir. 1966); *Kappa Sigma Fraternity v. Kappa Sigma Gamma Fraternity*, 659 F. Supp. 117, 118 (D.N.H. 1987) (defendant given up to three months to change name of fraternity); *Frank Brunckhorst Co. v. G. Heileman Brewing Co.*, 875 F. Supp. 966, 985 (E.D.N.Y. 1994) (defendant given six months to change beer trademark).

[99]   *See Attrezzi*, 436 F.3d at 43.

complete the process (already provisionally underway) of selecting and obtaining

clearance for a new mark, followed by a period of 210 days in which Unisys would

complete the work necessary to comply with the terms calling for elimination of the 3D

VISIBLE ENTERPRISE mark.  This request is based on a careful analysis by Unisys, as

described in some additional detail in the attached affidavit, of the complexity of the

potential task, and the number of employees and business days that would be required to

accomplish it.[100]

> ### 3.    The injunction should be limited to public uses of the term VISIBLE as a trademark, in a manner likely to cause confusion among relevant consumers

As noted, an injunction in a trademark case should provide only such protection

as is necessary to eliminate the likelihood of confusion."[101]  Thus, for example, in

*Electrolux* the First Circuit affirmed an injunction that permitted defendant to continue

using the infringing mark if it also used distinguishing terms in front of the mark, in the

same or greater-sized font.[102]  Other courts have followed a similar middle-ground

approach.[103]  Likewise, an injunction should be focused on public use of the disputed

---

[100]  *See* Exhibit B.

[101]  *Electrolux*, 999 F.2d at 4.

[102]  *Electrolux*, 999 F.2d at 4 ("otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer").

[103]  *See, e.g., AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979) (district court should have granted only limited injunction permitting use of mark in distinguishing context); *Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 724 F.2d 352, 354-55 (2d Cir. 1983) (affirming limited injunction permitting use of infringing mark with accompanying statement of non-association); *American Ass'n for Advancement of Science v. Hearst Corp.*, 498 F. Supp. 244, 262 (D.D.C. 1980) (injunction permitting defendant to use disputed mark with distinguishing context); *Pizitz, Inc. v. Pizitz Mercantile Co.*, 467 F. Supp. 1089, 1099 (N.D. Ala. 1979) (same); *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 441 F. Supp. 1220, 1239 (S.D.N.Y. 1977) (same); *Nissan Motor Co., Ltd. v. Nissan Computer Corp.*, 89 F. Supp. 2d 1154, 1165 (C.D. Cal. 2000)

term *as a trademark*.  Particularly in the case of a common descriptive term, a defendant should be permitted to use the term "in its primary, descriptive sense, while prohibit[ed]... from using that same term in a trademark sense."  That is, "injunctive relief can be fashioned to protect whatever trademark significance the term retains, while recognizing that the term is in the public domain for some purposes."[104]

As argued above, the evidence at trial amply demonstrated that whatever value the term VISIBLE may have as a trademark—that is, as an identifier of a particular source of goods or services—the ordinary English word "visible" (and its relatives "visibility" and the like) serve an important descriptive function, as powerful tools to help explain the concept of making something perceptible, and therefore understandable.  Any injunction in this case should recognize and allow for the continued use of the word "visible" in this ordinary communicative sense, while restricting its use as a trademark-identifier of goods or services.  The alternative—that Unisys would somehow undertake to expunge an everyday word from the vocabularies of some 30,000 employees—is self-evidently unworkable and unjustified.  By the same token, the injunction should focus on *public* uses of the term as a trademark, as opposed to purely internal corporate uses that have no conceivable potential to cause consumer confusion.

> **4.    The injunction should not require Unisys to revise historical uses of its 3D VISIBLE ENTERPRISE mark or other documents containing the word "visible"**

The injunction should also make clear that it does not seek to have Unisys "rewrite history" by deleting prior uses of the 3D VISIBLE ENTERPRISE mark (or other alleged infringing uses of VISIBLE) from historical documents such as press releases,

---

(same).
   [104] *See, e.g.*, McCarthy on Trademarks, § 30:3

annual reports, and marketing or other materials that are retained for corporate record-keeping purposes. Such a requirement would, among other things, implicate Unisys's obligations as a publicly traded company with respect to statements to the public about its business. Rather, the injunction should be limited to barring *new* uses of 3D VISIBLE ENTERPRISE or other offending trademarks.

> **5.     The injunction should be limited to uses of the disputed mark that are within Unisys's control**

In general, an injunction does not give rise to a duty on the part of the defendant to police the compliance of nonparties.[105] It is foreseeable that there may be uses of the 3D VISIBLE ENTERPRISE mark on, for example, third-party internet websites not under Unisys's control. Any injunction should make clear that such uses would not violate its terms.

> **6.     The injunction should have a dispute-resolution and cure procedure**

It is reasonable to anticipate that notwithstanding Unisys's best efforts to identify and remove all uses of the 3D VISIBLE ENTERPRISE mark covered by the injunction, VSC may in the ensuing months identify instances, on the internet or elsewhere, in which the mark exists where VSC claims Unisys has an obligation to remove it. Rather than fostering opportunities for further litigation about such matters, the injunction should incorporate a reasonable procedure involving notice by VSC to Unisys and an opportunity to cure the alleged violation and/or to resolve any differences between the parties. Unisys's proposed form of injunction sets forth such a procedure.

---

[105] *Max's Seafood Cafe v. Quinteros*, 176 F.3d 669, 673 (3d Cir. 1999).

**V.       VSC is not entitled to the other relief it seeks**

   **A.       VSC has no right to disgorgement**

As noted, during trial VSC's counsel confirmed that its theory of damages was limited to its contention that it had lost sales, and as a result lost profits, during the four months following Unisys's June 2004 launch of 3D VISIBLE ENTERPRISE in the United States.[106]   Again, Unisys relied on VSC's representation in determining what evidence to present on the issue of damages.   VSC therefore waived any claim that it was entitled to an accounting or disgorgement of Unisys's profits from any alleged infringing sales.   At the charge conference, the Court reminded VSC's counsel of the colloquy on this subject.[107]   Despite this, VSC now brazenly suggests that the Court should award $100 million in damages based on Unisys's supposed "unjustly gained profits," or schedule a "supplemental jury trial" on the subject.

The Court also observed at the charge conference that plaintiff had simply failed to offer any sufficient evidence to support any claim for disgorgement.[108]   This ruling was correct.   Again, there is, in a trademark case, "a clear distinction between the showing required to establish a right to injunctive relief and that required to establish a right to damages" or other monetary remedy, including an accounting of the defendant's profits.[109]   The standard for a monetary remedy is "considerably higher... than... mere likelihood of confusion."[110]

The First Circuit and others "have articulated three justifications for awarding to

---

[106]   *See* Transcript 7/27 at 82-83.
[107]   *See* Transcript 7/30 (Charge Conference) at 47:4-16.
[108]   *See* Transcript 7/30 (Charge Conference) at 31:16-18; 47:2-48:4; 48:23-49:13; 50:6-7.
[109]   *See Electrolux*, 999 F.2d at 5.
[110]   *See Eckel*, 26 F. Supp. 2d at 317.

plaintiff an accounting" in a trademark case: "(1) as a rough measure of the harm to the

plaintiff; (2) to avoid unjust enrichment; or (3) if necessary to protect the plaintiff by

deterring a willful infringer from further infringement."[111]

To proceed under the "rough measure of harm to the plaintiff" justification, "a

plaintiff seeking an accounting of defendant's profits must show that" the parties'

respective products or services "directly compete, such that defendant's profits would

have gone to plaintiff if there was no violation."[112]  The plaintiff must also show that it

has suffered actual harm as a result of the defendant's conduct.[113]  In addition, the First

Circuit has "explicitly left unresolved the question of whether 'willfulness' is a

precondition for an accounting," in addition to direct competition and actual harm, under

the "harm to the plaintiff" rationale.[114]

Leaving aside for the moment the absence of evidence in this case of actual harm

or willfulness, where there is no direct competition, the defendant "can hardly be

thought,... to be a trustee for profits which but for the infringement would have been

plaintiff's."[115]  Thus, courts in this circuit have consistently rejected accounting as an

available remedy in cases where plaintiffs proved trademark infringement but no direct

---

[111]  *Tamko Roofing*, 282 F.3d at 36.  To the extent such a theory of recovery is fundamentally equitable in nature, a plaintiff arguably has no right to a jury trial.  *See, e.g., Juicy Couture, Inc. v. L'Oreal USA, Inc.*, 2006 WL 559675 (S.D.N.Y. Mar. 7, 2006).

[112]  *Electrolux*, 999 F.2d at 5.

[113]  *See, e.g., Vermont Pure Holdings v. Nestle Waters North Am., Inc.*, 2006 WL 839486 at *13 (D. Mass. March 28, 2006) ("Put simply, *AB Electrolux* and *Tamko* teach that actual harm *and* direct competition" may support claim for accounting (emphasis added)).

[114]  *Vermont Pure Holdings*, 2006 WL 839486, *13 n.14.

[115]  *Electrolux*, 999 F.2d at 5 (quoting *Valmor Prods. Co. v. Standard Prods. Corp.*, 464 F.2d 200, 204 (1st Cir. 1972)).

competition.[116]  In this case, as argued above, and VSC's conclusory assertions to the contrary notwithstanding, there is no evidence of competition—and certainly no evidence of "direct" competition—between the business conducted by Unisys under the 3D VISIBLE ENTERPRISE mark and any goods or services offered by the plaintiff under its VISIBLE mark.[117]  Under these circumstances, it is inconceivable that whatever success Unisys may have had in consulting engagements associated with the 3D VISIBLE ENTERPRISE mark somehow equates to similar success *VSC* would have had but for the alleged infringement.  Accordingly, an accounting could not possibly be justified as a "rough measure" of any alleged harm to VSC.

Furthermore, even assuming VSC had been able to show direct competition, as argued above it failed to demonstrate at trial that it has suffered any actual harm, given (a) the absence of even a single instance, during the three years since this dispute began, of any actual confusion or mistake by a customer or potential customer of either party about whether there was a connection between the companies or their goods or services, (b) the lack of any rational basis to link VSC's historically poor financial performance to anything Unisys has done, and (c) the absence of any evidence of actual (as opposed to hypothetical) harm to VSC's goodwill or reputation.  Nor is there any basis, as explained above, for a finding that Unisys acted willfully.[118]  For these additional reason, VSC

---

[116]  *See Electrolux,* 999 F.2d at 6 (upholding trial court's denial of accounting where no direct competition between parties' products); *Raxton Corp. v. Anania Assoc., Inc.*, 668 F.2d 622, 625 (1st Cir. 1982) (same); *Valmor Prods.,* 464 F.2d at 204 (reversing trial court's award of accounting where no direct competition).

[117]  *See supra*, pp. 6 *et seq.*

[118]  VSC refers in its motion to Magistrate Judge Bowler's July 12, 2007 ruling in favor of Unisys on a discovery motion filed by VSC.  But VSC did not "appeal" from the order within the meaning of Fed. R. Civ. P. 72(a), as it suggests it did; it failed to "file and serve"  objections to the order within 10 days, as required by the Rule.  *And see*

cannot as a matter of law be entitled to an accounting.

As noted, in some trademark cases an accounting may be warranted as a means of avoiding unjust enrichment, or as a deterrent to future infringement—though "the role of deterrence must be carefully weighed in light of the [Lanham Act's] prohibition on the imposition of penalties" and "the deterrence rationale... should not be the primary reason for an accounting of profits."[119]  To obtain an accounting on an unjust-enrichment or deterrence theory, a plaintiff must demonstrate that the defendant acted fraudulently or in bad faith.[120]  As noted above, however, this Court has already concluded, at summary judgment, in rulings on pre-trial motions, and at the charge conference at the close of the case, that there is no evidence of such conduct by Unisys.

Even aside from this, there is also no rational basis for a finding that Unisys was "enriched" by use of the term VISIBLE in 3D VISIBLE ENTERPRISE.  First, as the Court noted at the charge conference, there was no sufficient basis in the evidence from which the jury could determine to what extent Unisys revenues derived from use of the 3D VISIBLE ENTERPRISE mark.[121]  Second, the Unisys financial data on which VSC

---

Wright & Miller, 12 Federal Practice and Procedure § 3069 at 348 (1997 & 2007 supp.) (appeal must be in writing, citing legislative history of rule).  Nor is there any other reason to revisit these discovery matters now.

[119]  *Tamko Roofing*, 282 F.3d at 38.

[120]  *See Electrolux,* 999 F.2d at 5-6 ("the general rule of direct competition is loosened if the defendant acted fraudulently or palmed off inferior goods"; "under our case law damages have never been allowed under the deterrence or unjust enrichment theories absent some form of fraud"; "appellee did not act in bad faith so as to loosen the direct competition or actual harm rule").

[121]  *See* Transcript 7/30 (Charge Conference) at 47-49.  And indeed, while no party in Unisys's position would have adopted and continued to use a mark such as 3D VISIBLE ENTERPRISE mark without believing that it had some utility in conducting its business, it would defy common sense to conclude that clients' decisions about whether to retain Unisys for large-scale consulting engagements are substantially influenced by Unisys's selection of the term VISIBLE, or any other particular word.

sought (and now seeks again) to rely—for example, Unisys's 2004-06 annual reports—show that Unisys's services business segment has reported substantial net *losses* in each year since the launch of the mark.[122]

Therefore, an accounting cannot be justified in this case on an unjust-enrichment or deterrence theory.

### B.    VSC is not entitled to multiple damages or attorneys' fees under the Lanham Act

VSC includes in its motion a passing suggestion that the Court should award multiple damages under 15 U.S.C. § 1117(a) (which VSC miscites).  Enhancement of damages under this statute is permitted only "based on a showing of actual harm," in a case where inherent difficulty in measuring or proving damages has left the plaintiff with inadequate compensation, or where necessary to deter future infringement.  The award "may not be punitive," nor may it result in a windfall.[123]

As argued above, there was no sufficient evidence to support a rational conclusion that VSC has suffered any actual harm as a result of Unisys's use of the 3D VISIBLE ENTERPRISE mark, and the jury's award of damages had no adequate basis.  But this was simply a failure by VSC to meet its burden of proof, not a matter warranting redress

---

[122]   *See* Trial Exhibit 170 at 53 ($82.8 million reported operating loss in services segment for 2004); Exhibit 169 at 47 ($207 million reported operating loss in services segment for 2005); Exhibit 168 at 45 ($22.6 million reported operating loss in services segment for 2006).

[123]   *Babbit Elecs., Inc. v. Dynascan Corp.,* 38 F.3d 1161, 1183 (11th Cir. 1994) (per curiam); *Jurgens v. McKasy*, 927 F.2d 1552, 1563-64 (Fed Cir. 1991) (district court abused its discretion in increasing the jury damage award where it did so not to correct for difficulty in measuring or proving damages, but to penalize defendant); *Bowmar Instrument Corp. v. Continental Microsystems, Inc.*, 497 F.Supp. 947, 961 (S.D.N.Y. 1980) (quoting *Caesars World, Inc. v. Venus Lounge, Inc.*, 520 F.2d 269, 274 (3d Cir. 1975)) (under § 1117(a), plaintiff was limited to actual damages determined by evidence presented at trial); *Eckel*, 26 F. Supp. 2d at 317-18 (quoting *Quabaug Rubber Co.*, 567 F.2d at 161).

by the Court through an equity-based award of any damages—whether single or multiple. Nor are there any grounds for identifying a need to deter future infringement.[124] Accordingly, VSC's reliance on § 1117(a) is misplaced.[125]

The same is true for VSC's request for attorneys' fees under the Lanham Act. The statute provides for awards of attorneys' fees only in "exceptional cases."[126] The First Circuit has held that such awards may be appropriately made where the defendant's "acts of infringement were malicious, fraudulent, deliberate, or willful," where equitable considerations justify such an award, and where the district court "supportably finds the case exceptional."[127] The court has made clear that a finding of "willfulness" by a jury is itself not sufficient to support such an award.[128] The factors to be considered by the court include whether the applicable law is uncertain in relevant respects, whether there are close legal questions involved, whether a party in the defendant's position might reasonably think it did not infringe, whether the defendant intended to deceive or confuse consumers, whether the defendant made a concerted effort to create a non-infringing

---

[124] VSC offers no factual support for the notion that future infringement by Unisys is likely in the absence of a deterrent. And none of the decisions cited by VSC on this point arises from comparable facts. *See Truck Equip. Serv. Co. v. Freuhauf Corp.*, 536 F.2d 1210, 1223 (8th Cir. 1976) (defendant "deliberately copied" protected design in "bad faith," and thereby "sought and received the benefits of [plaintiff's] goodwill" and "set upon a course of conduct which, in practical effect, would destroy the [plaintiff's] good reputation."); *International Star Class Yacht Racing Assoc. v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 72 (2d Cir. 1998) (declining to consider appropriateness of deterrence absent record evidence "as to the egregiousness of [defendant's] conduct.").

[125] VSC's motion also seeks multiple damages and other relief under Mass. Gen. L. ch. 93A, but VSC has since withdrawn this claim.

[126] 15 U.S.C. § 1117(a).

[127] *Tamko Roofing*, 282 F.3d at 31-32.

[128] *Tamko Roofing*, 282 F.3d at 31 n.5 ("To the extent Ideal argues that it would be error for a district court to adopt a per se equivalence between 'exceptional case' and a jury finding of willfulness, we would agree....").

mark, and whether the plaintiff suffered actual damage.[129]

In *Tamko Roofing*, the First Circuit upheld an award of attorneys' fees based on evidence of egregious conduct by the defendant, Ideal. The Court noted that (1) Ideal adopted the infringing mark within days after attending a trade show where plaintiff Tamko's mark was prominently displayed; (2) Ideal told its advertising agency not to do a trademark search, and its own lawyer did no search either; (3) Ideal considered other names that were substantially similar to competitors' marks; (4) Ideal designed its mark with a cursive script similar to Tamko's; (5) the parties were direct competitors, and Ideal was seeking to increase its share of the common market; (6) Ideal ignored letters from Tamko warning of the infringement; (7) Ideal violated a court injunction against use of its mark, and was found in contempt; and (8) even after the contempt finding, Ideal delayed its compliance.[130]

No such evidence is present in this case. There is nothing exceptional about Unisys's conduct in the case. Indeed, as argued above, the evidence clearly shows that Unisys has consistently had a reasonable, good-faith belief that, for all the reasons cited herein, it was not (and is not) infringing any trademark rights of VSC. The Court itself regarded this case as "about as thin a case as I have seen." Again, Unisys has never sought to "palm off" its services as those of VSC, to trade on its reputation, or to damage VSC or prevent legitimate competition. Such a case does not conceivably qualify as "exceptional" or warrant an award of attorneys' fees to the plaintiff.

---

[129] *Tamko Roofing*, 282 F.3d at 32-33. Some courts have applied a "clear and convincing" standard of proof to the question of whether a case is exceptional. *See*, *e.g.*, *Icon Health and Fitness, Inc. v. The Nautilus Group, Inc.*, 2006 WL 753002, *9 (D. Utah 2006); *Callaway Golf Co. v. Slazenger*, 384 F. Supp. 2d 735, 748 (D. Del. 2005); *Sun Prods. Group, Inc. v. B & E Sales Co., Inc.*, 700 F. Supp. 366, 388 (E.D. Mich. 1988).

[130] *Tamko Roofing*, 282 F.3d at 33.

<u>Request for Oral Argument</u>

Unisys hereby respectfully requests that the Court schedule oral argument on the two motions addressed in this memorandum.


Dated: September 18, 2007

UNISYS CORPORATION,
By Its Attorneys,


  /s/ William L. Boesch
Anthony M. Doniger, BBO No. 129420
doniger@srbc.com
William L. Boesch, BBO No. 558742
boesch@srbc.com
SUGARMAN, ROGERS, BARSHAK
  & COHEN, P.C.
101 Merrimac Street
Boston, MA 02114
617-227-3030

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document is being filed through the ECF system, and that I am therefore relying on the system to complete service by sending copies of the filing electronically to the necessary counsel, who are registered participants.


  /s/ William L. Boesch

395115.10