UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VISIBLE SYSTEMS CORPORATION,<br><br>　　　　　　　　Plaintiff<br><br>v.<br><br>UNISYS CORPORATION,<br><br>　　　　　　　　Defendant | Civil Action No. 04-CV-11610-RGS |

## AFFIDAVIT OF STANLEY A. MATTOS

　　　　I, Stanley A. Mattos, state as follows under oath, and, except where otherwise indicated, of my own personal knowledge:

　　　　1.　　　　I am an employee of Unisys Corporation based in its offices in Charlotte, North Carolina. My title is Partner and Six Sigma Black Belt. ("Six Sigma" refers to a widely recognized set of practices for improving the quality and consistency of business processes.) I have an M.B.A. degree and am a former Lieutenant Colonel in the United States Marine Corps. I have worked for Unisys for seven years, and have over thirty years of national and international experience providing information technology services to clients in the public sector (local, state, and federal government) and the fields of financial services, telecommunications, and higher education.

　　　　2.　　　　I have been coordinating a team of employees working on preparing to respond to a potential injunction in this case concerning Unisys's use of the 3D VISIBLE ENTERPRISE mark. I report directly to Unisys's Chief Marketing Officer, Ellyn Raftery, on this project.

　　　　3.　　　　After discussions internally and with counsel following the jury's verdict in this case on July 31, Unisys management decided to respond to the verdict in three principal ways:

    a.  Its counsel would file appropriate papers to challenge the verdict, and to seek to ensure that if an injunction were entered against Unisys, it was proper and reasonable in its scope and terms;

    b.  Unisys would promptly advise its sales, marketing and communications employees of the verdict, and direct them that, among other things, while Unisys's challenge to the verdict was going on, and as a precautionary measure, no new marketing or advertising materials using the 3D VISIBLE ENTERPRISE mark should be produced or disseminated; and

    c.  A team of Unisys personnel, coordinated by me, would endeavor to assess the scope of the work that would be necessary in order to respond to a potential injunction—in order to be able, among other things, to explain to the Court what time and resources Unisys would reasonably need to respond. This group would also begin the planning and preparation for a response to a potential injunction.

    4.  I understand that the first part of this plan—the filing of papers by Unisys's counsel—is being carried out now. The second part of the plan was accomplished shortly after the July 31 verdict: a directive was issued to Unisys sales, marketing and communications personnel that, among other things, on an interim basis new advertising or other materials referring to Unisys's consulting approach should not make use of the 3D VISIBLE ENTERPRISE mark.

    5.  As to the third part of the plan, in the weeks since the July 31 verdict, approximately 23 teams of Unisys personnel (comprising some 75 to 100 employees in all) have been involved in efforts to assess the scope of the work that would be necessary to respond to a

potential injunction against use of the 3D VISIBLE ENTERPRISE mark, and to plan and prepare for such a response. These assessment and planning efforts, and their results, are described in more detail below.

      6.      In early August, Unisys asked an outside "brand consulting" firm, Interbrand, to begin work on developing a potential replacement for the 3D VISIBLE ENTERPRISE mark. That work has proceeded quickly, and has at present led to the development of a shortlist of possible replacement marks. The remaining steps in this selection process include review of the list by the responsible decision-makers within Unisys, leading to a final decision about which of the potential replacements would be selected if and when necessary. In addition, our trademark attorneys must complete clearance investigations in the United States and in numerous foreign countries where Unisys does business, to ensure that any potential mark is properly available for use.

      7.      The Unisys group involved in assessing the scope of the work necessary to respond to a potential injunction used a variety of methods and tools to determine how many Unisys "assets"—marketing and other materials that might be affected by an injunction—currently make use of the 3D VISIBLE ENTERPRISE mark. The group considered materials within each of Unisys's various business segments. It considered tangible, physical materials such as displays, signs, posters, pamphlets, merchandise and the like, which exist in Unisys's numerous facilities throughout the United States. (Unisys presently owns or leases property in some 114 locations in 38 different states.) The group also considered materials that are stored and/or displayed electronically. As described further below, these include electronic copies of marketing materials, "white papers," website pages and other documents made available to the public via the internet.

8. After a careful review of the data provided by the teams involved in this assessment, I estimate that if an injunction were entered requiring Unisys to cease using 3D VISIBLE ENTERPRISE as a trademark in the United States, the number of individual documents or other materials that would have to be examined and potentially destroyed or revised is close to 300,000. Examples of the kinds of materials and necessary tasks are given below.

9. Based on the information gathered about types and numbers of uses of the 3D VISIBLE ENTERPRISE mark, and the work necessary to examine the affected items and, where appropriate, revise them, I conducted a further detailed analysis of the numbers of employees in each relevant area of expertise and authority who would need to be used for this work, and how much of their time would be needed to accomplish it. As a result of this analysis, I estimate that the project would require over 250 employees working more than 200 business days.

10. To begin with, it is clear that even with documents stored and distributed in electronic form, removing and revising uses of the 3D VISIBLE ENTERPRISE mark would not simply be a matter of conducting an electronic search with instructions to substitute a new mark mechanically for the existing one. The 3D VISIBLE ENTERPRISE mark is intended to describe a goal Unisys believes its client organization have, involving making their structures and processes more transparent and understandable by using Unisys's consulting services and underlying methodologies. The mark is used in a wide variety of contexts and with variations of situation-specific meaning and emphasis. The mark (and its corresponding logo) are also frequently used in graphical images and other non-textual settings. Even with the assistance of electronic search tools, Unisys personnel would have to read and understand the documents in

which the mark appears, in order to be able to make intelligent substitutions of a new mark. The employees would also have to understand how the substitute mark (still to be selected, as I said earlier) is intended to be used, and to what extent its intended usage is the same as or different from that of 3D VISIBLE ENTERPRISE, and would then have to apply these rules to particular documents based on an understanding of their purpose and meaning.

11.    I can provide some examples of the categories of documents that would need review, and the scope of the work involved. One obviously affected area would be the Unisys public company website www.unisys.com, which currently comprises approximately 20,000 pages of text and images, plus tens of thousands of items (for example, documents in PDF form) that may be downloaded from the site. Many thousands of those pages and documents use the 3D VISIBLE ENTERPRISE mark in some way. Each one of these pages would have to be individually reviewed and edited—or in some cases, removed and replaced with entirely new content.

12.    As another example, Unisys also maintains approximately 14 internal websites where documents and information are made available for use by Unisys sales, marketing, and consulting personnel. Some of the resources available on these sites, many thousands of which use the 3D VISIBLE ENTERPRISE mark, are intended or may be used for communications with potential new clients. Such items intended for use outside Unisys would require individual review and editing. A related area is the Unisys Bookstore, which maintains a catalog of technical manuals and other educational materials for Unisys employees. Here again, the nature of some of these materials is such that they may be not only used internally, but shared in whole or in part with clients or others outside Unisys. I am informed that the number of materials

5

within the Bookstore's collection that would have to be assessed and potentially revised in response to an injunction is estimated at more than 5,500.

13. A third example: the company maintains extensive "repositories" of the work-product resulting from its blueprint-based consulting for clients, which is designed to be re-used in subsequent engagements. Because these documents will or may be shared with potential new clients, and many of them utilize the 3D VISIBLE ENTERPRISE mark, they too would be subject to the same kind of one-by-one review and revision. I understand that the number of such documents that have been identified as potentially requiring such attention is more than 6,000.

14. In addition to the time and extensive resources necessary to address the use of the 3D VISIBLE ENTERPRISE mark in documents maintained electronically in these and other locations, other Unisys personnel would be assigned to locate, evaluate and make changes to *tangible* materials in various forms that Unisys has used to advertise its consulting services under the 3D VISIBLE ENTERPRISE mark. These include, for example, posters and displays in Unisys facilities throughout the United States, booth structures used for trade shows, and the like.

15. Unisys's sales and marketing teams would also need a reasonable opportunity, in the event of an injunction against future use of the 3D VISIBLE ENTERPRISE mark, to develop new marketing and advertising materials based on the new mark the company selects, and to publish and distribute the materials within and outside the company. Substantial time and energy would be needed to educate the company's approximately 30,000 employees (through mechanisms such as Unisys University, our internal education system) on the need to change terminology that they have assimilated and grown used to over the past three and a half years.

A program would likely have to be put in place to respond to questions from employees about interpretation of the injunction or its application to particular circumstances.

16.I used the results of the analysis outlined above to develop a reasonable project plan and timeline for compliance with a potential injunction.

17.To begin with, I am informed that reasonable expectations as to the time for completion of the remaining steps in selecting a potential replacement for the 3D VISIBLE ENTERPRISE mark, and conducting the necessary comprehensive United States and international trademark-clearance searches as described above, are that this work will be completed by on or about October 15, 2007.

18.I have reviewed the proposed form of an injunction that Unisys's counsel is submitting to the Court in this case. Assuming that an injunction in this form was in place in this case as of October 15, my analysis of the information provided to me by the employees involved in this project is that Unisys would reasonably require a period of 210 calendar days (that is, seven months), or until May 12, 2008, to complete the work required by such an injunction.

19.This estimate begins with the projections cited above as to the specific tasks that would be required to comply with an injunction, and the number of employees and amount of time necessary to complete the tasks. As I indicated, in total my estimate based on this data is that 250 employees and 200 *business* days of work would be needed. I have naturally attempted to assess the extent to which multiple parts of the project could be done simultaneously, which could shorten the overall time needed. But I have also attempted to take into account realistic expectations about how much of the working time of the affected employees can be entirely devoted to this project, having in mind the employees' significant other responsibilities and the company's need to continue conducting business. This factor would lead to more time being

7

required to complete this project. My ultimate estimate of 210 calendar days represents a balancing of these and other factors.

20. Of course, should the scope of the injunction prove to be broader than the one proposed by Unisys's counsel, the analysis outlined in this affidavit and the resulting plan and timeline would have to be revised accordingly.

SIGNED UNDER PENALTIES OF PERJURY,

            /s/ Stanley A. Mattos
            Stanley A. Mattos

Dated: September 18, 2007

395762.7